**ORAL ARGUMENT HAS NOT BEEN SCHEDULED**

# In the United States Court of Appeals for the District of Columbia Circuit

**Nos. 24-1094 and 24-1150 (consolidated)**
—————————

APPALACHIAN VOICES, *ET AL.*,
*Petitioners,*

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

—————————

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

—————————

## BRIEF OF RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION

—————————

Matthew R. Christiansen
  General Counsel

Robert H. Solomon
  Solicitor

Jason T. Perkins
  Attorney
  jason.perkins@ferc.gov

For Respondent
Federal Energy Regulatory
  Commission
Washington, D.C. 20426

OCTOBER 3, 2024

## CIRCUIT RULE 28(A)(1) CERTIFICATE

### A.    Parties

On June 14, 2024, Duke Energy Carolinas, LLC and Duke Energy

Progress, LLC (collectively, Duke) moved to intervene in this case in

support of the Commission.  *See* ECF No. 2059999, *granted* Aug. 21,

2024 (ECF No. 2071245).  Otherwise, the parties before this Court are

identified in Petitioners' Circuit Rule 28(a)(1) certificate.

### B.    Rulings Under Review

**1.**  *Mountain Valley Pipeline, LLC*, Order Granting Extension of

Time Request, 185 FERC ¶ 61,208 (Dec. 19, 2023) ("Extension Order"),

R. 886, JA___-___;

**2.**  *Mountain Valley Pipeline, LLC*, Notice of Denial of Rehearing

By Operation of Law and Providing for Further Consideration,

186 FERC ¶ 62,069 (Feb. 20, 2024), R. 905, JA___; and

**3.**  *Mountain Valley Pipeline, LLC*, Order Addressing Issues

Raised on Rehearing, 187 FERC ¶ 61,039 (Apr. 25, 2024) ("Rehearing

Order"), R. 913, JA___-___.

### C.    Related Cases

This case has not previously been before this Court or any other

court.  *Sierra Club v. FERC*, 38 F.4th 220 (D.C. Cir. 2022) (Case No.

20-1427), denied a petition for review of Commission orders granting

the underlying FERC certificate; the construction deadline established

in those earlier orders was extended by the later orders challenged

here.  Issues relating to FERC construction deadline extensions under

the Natural Gas Act regarding other certificated projects were raised

before the Court by petitioner Sierra Club in *Sierra Club v. FERC*,

97 F.4th 16 (D.C. Cir. 2024) (Case Nos. 22-1233, *et al.*) (denying

petitions for review).

*/s/ Jason T. Perkins*
Jason T. Perkins
Attorney

## <u>TABLE OF CONTENTS</u>

Introduction and Statement of Issues .................................................. 1

Statutory and Regulatory Provisions .................................................. 4

Statement of Facts………………………………………………………4

I.    Statutory and Regulatory Background...................................... 4

      A.    Pipeline Certifications Under the Natural Gas Act .......... 4

      B.    Construction Deadlines for Certificated Pipelines........... 5

II.   Procedural Background............................................................. 7

      A.    Mountain Valley's Proposed Southgate Project and the
            Commission's 2020 Certificate Order............................... 7

            1.    Market Need for the Project ................................... 10

            2.    Environmental Impacts of the Project.................... 11

            3.    Construction Timing for the Project....................... 12

      B.    This Court's *Southgate* Decision, Affirming FERC
            Certificate Orders............................................................ 14

      C.    Mountain Valley's Construction Deadline Extension
            Request............................................................................ 16

      D.    The Commission Orders on Review ............................... 18

            1.    The Extension Order............................................... 18

            2.    Rehearing Request and Mountain Valley's
                  Project Update....................................................... 20

3.    The Rehearing Order ............................................. 23

Summary of Argument .................................................... 25

Argument .................................................................... 27

I.    Standard of Review .................................................. 27

II.   The Commission Reasonably Granted an Extension of the
      Commission-Imposed Deadline for Project Construction ........ 29

      A.    The Commission Reasonably Found that Mountain
            Valley Satisfied the "Good Cause" Standard Consistent
            with *Northern Access Extension* ........................ 29

            1.    Construction Deadlines and Related Extensions of
                  Time Are Matters of Agency Discretion ............. 29

            2.    The Commission Reasonably Found that Good
                  Cause Exists Here ................................. 31

      B.    Appalachian's Arguments that Mountain Valley
            Abandoned the Project or Failed to Advance It Are
            Unavailing ............................................. 34

            1.    Appalachian Misconstrues Mountain Valley's
                  Anticipated Redesign of the Project as a
                  New Project ....................................... 34

            2.    Appalachian Underappreciates the Southgate
                  Project's Dependence on the Mainline System ....... 37

            3.    Appalachian's Attempts to Distinguish Past
                  Commission Orders Are Not Persuasive .............. 40

iv

III.  The Commission Reasonably Explained Why It Declined to
      Revisit Its Past Analyses of The Project's Market Need and
      Environmental Impacts ............................................................ 43

      A.   Past Decisions May Be Reopened Only Upon
           Identification of Significant New Information or
           Circumstances ................................................................ 43

      B.   The Commission Reasonably Explained Why It
           Declined to Revisit Its Market Need Analysis ................ 45

           1.   Demand for the Project's Services Only
                Increased ................................................................ 45

           2.   Appalachian's Other Contentions Lack Merit ........ 49

      C.   The Commission Reasonably Explained Why It
           Declined to Revisit Its Environmental Analysis ............ 55

           1.   The Evidence Gathered After the Certificate
                Rehearing Order Did Not Indicate Significant
                Erosion and Sedimentation Problems for Aquatic
                Resources ................................................................ 56

           2.   Nothing About the Extension Request Itself
                Required Further Environmental Study ................ 61

Conclusion ........................................................................ 63

# TABLE OF AUTHORITIES

## COURT CASES:

*City of Oberlin, Ohio v. FERC,*
    937 F.3rd 599 (D.C. Cir. 2019)................................................... 51

*Env't Defense Fund v. FERC,*
    2 F.4th 953 (D.C. Cir. 2021)..................................................... 50

*Fairless Energy, LLC v. FERC,*
    77 F.4th 1140 (D.C. Cir. 2023).................................................. 10

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) ................................................................ 28

*FERC v. Elec. Power Supply Ass'n,*
    577 U.S. 260 (2016) ................................................................ 28

*Gunpowder Riverkeeper v. FERC,*
    807 F.3rd 267 (D.C. Cir. 2015)................................................... 5

*LSP Transmission Holdings II, LLC v. FERC,*
    45 F.4th 979 (D.C. Cir. 2022).................................................... 28

*Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.,*
    498 U.S. 211 (1991) ................................................................ 37

*Mountain Valley Pipeline, LLC v. N.C. Dep't of Env't Quality,*
    990 F.3d 818 (4th Cir. 2021) (*North Carolina*)............. 13, 13-14

*Minisink Residents for Env't Pres. & Safety v. FERC,*
    762 F.3d 97 (D.C. Cir. 2014) ................................................37, 43

*Myersville Citizens for a Rural Community, Inc. v. FERC,*
    783 F.3d 1301 (D.C. Cir. 2015)....................................... 29, 53-54

*New Jersey Conservation Found. v. FERC,*
    111 F.4th 42 (D.C. Cir. 2024) ...............................................52, 54

*Sacramento Mun. Util. Dist. v. FERC,*
    616 F.3d 520 (D.C. Cir. 2010) ........................................28, 33, 45

*Sierra Club v. FERC,*
    38 F.4th 220 (D.C. Cir. 2022) (*Southgate*)
    ……………………………2-3, 4-5, 14-16, 28-29, 44-45, 55-56, 60-61

*Sierra Club v. FERC,*
    68 F.4th 630 (D.C. Cir. 2023) (*Mainline Extension*),
    *vacated by* 2023 WL 5537562 (D.C. Cir. Aug. 25, 2023)........... 60

*Sierra Club v. FERC,*
    97 F.4th 16 (D.C. Cir. 2024) (*Northern Access Extension*)
    ……………….............2, 5-7, 27-28, 30-33, 37, 39-41, 44-50, 54, 62

*Sierra Club v. State Water Control Bd.,*
    64 F.4th 187 (4th Cir. 2023) (*Virginia Board*).......... 59-60, 60-61

*Sierra Club v. W.V. Dept. of Envt'l Prot.,*
    64 F.4th 487 (4th Cir. 2023) .................................................... 59

*Township of Bordentown, N.J. v. FERC,*
    903 F.3d 234 (3d Cir. 2018) .................................................... 49

**ADMINISTRATIVE CASES:**

*Adelphia Gateway, LLC,*
    178 FERC ¶ 61,030 (2022) .................................................. 40-41

*Algonquin Gas Transmission, LLC,*
    174 FERC ¶ 62,179 (2021) ..................................................... 42

*ANR Pipeline Co.,*
    179 FERC ¶ 61,122 (2022) ..................................................... 48

*Arlington Storage Co., LLC,*
    155 FERC ¶ 61,165 (2016) .................................................. 31, 39

*Chestnut Ridge Storage LLC,*
    139 FERC ¶ 61,149 (2012) ........................................................ 39

*Const. Pipeline Co., LLC,*
    165 FERC ¶ 61,081 (2018) .................................................. 31, 32

*Delfin LNG LLC,*
    181 FERC ¶ 61,144 (2022) ........................................................ 31

*Gulf South Pipeline Co., LP,*
    170 FERC ¶ 61,201 (2020) ........................................................ 48

*Leaf River Energy Center LLC,*
    156 FERC ¶ 61,015 (2016) ................................................... 39-40

*Mountain Valley Pipeline,*
    171 FERC ¶ 61,232 ("Certificate Order"), *on reh'g,*
    172 FERC ¶ 61,261 (2020) ("Certificate Rehearing Order"),
    *petition for review denied by Southgate,* 38 F.4th 220
    .......................................................... 2-3 , 7-14, 21, 47-53, 55

*Mountain Valley Pipeline, LLC,*
    179 FERC ¶ 61,013 (2022) ("Mainline Amendment Order").... 42

*Mountain Valley Pipeline, LLC,*
    185 FERC ¶ 61,208 (2023) ("Extension Order"), *on reh'g,*
    187 FERC ¶ 61,039 (2024) ("Rehearing Order")
    .................................. 12-13, 16-25, 29-36, 38-46, 48-55, 58-62

*Nat'l Fuel Gas Supply Corp.,*
    179 FERC ¶ 61,226 (2022) ........................................................ 31

*Nat. Gas Pipeline Co. of Am. LLC,*
    169 FERC ¶ 61,050 (2019) ........................................................ 48

*Nat'l Grid LNG LLC,*
    165 FERC ¶ 61,031 (2018) ........................................................ 48

*N. Nat'l Gas Co.,*
    184 FERC ¶ 61,186 (2023), *on reh'g,*
    186 FERC ¶ 61,064 (2024) ........................................... 50-51, 53

*PennEast Pipeline Co., LLC,*
    170 FERC ¶ 61,138 (2020) .................................................. 32, 42

*Port Arthur LNG, LLC,*
    181 FERC ¶ 61,024 (2022) ........................................................ 31

*RH energytrans, LLC,*
    165 FERC ¶ 61,218 (2018) .................................................. 11, 53

*Transcon. Gas Pipe Line Co., LLC,*
    182 FERC ¶ 61,148 (2023), *petition for review granted
    by N.J. Conservation Found. v. FERC*, 111 F.4th 42 .............. 52

*Trunkline Gas Co., LLC,*
    179 FERC ¶ 61,086 (2022) .................................................. 31-32

## **STATUTES:**

Administrative Procedure Act
    5 U.S.C. § 706(2)(A) ................................................................ 28

Fiscal Responsibility Act of 2023
    Section 324, Pub. L. No. 118-5, 137 Stat. 47 ........................... 19

Natural Gas Act
    Section 7, 15 U.S.C. § 717f ..................................................... 4-5

    Section 16, 15 U.S.C. § 717*o* ..................................................... 6

ix

Section 19, 15 U.S.C. § 717r.................................................... 7, 61

## REGULATIONS:

18 C.F.R. § 157.14(a) ......................................................... 8

18 C.F.R. § 157.20(b) ...................................................... 5-6, 29

18 C.F.R. § 385.2005(a) .................................................... 47

18 C.F.R. § 385.2008(a) ...................................................... 6

# GLOSSARY

| | |
|---|---|
| Appalachian | Petitioners Appalachian Voices, Blue Ridge Environmental Defense League, Center for Biological Diversity, Chesapeake Climate Action Network, Haw River Assembly, Natural Resources Defense Council, Sierra Club, and Wild Virginia |
| Br. | Opening brief of petitioners |
| Certificate Order | *Mountain Valley Pipeline, LLC*, 171 FERC ¶ 61,232 (June 18, 2020), R. 601, JA___-___ |
| Certificate Rehearing Order | *Mountain Valley Pipeline, LLC*, 172 FERC ¶ 61,261 (Sept. 17, 2020), R. 628, JA___-___ |
| Commission or FERC | Federal Energy Regulatory Commission |
| Dominion | Intervenor for Respondent Public Service Company of North Carolina, Inc. d/b/a Dominion Energy North Carolina, a local distribution utility that operates a natural gas pipeline system in all or part of 28 North Carolina counties |
| Duke Carolinas | Intervenor for Respondent Duke Energy Carolinas, LLC, which, together with its affiliate Duke Energy Progress, LLC, provides electric service to 4.5 million total customers in the Carolinas |
| Environmental Impact Statement | Final Environmental Impact Statement for Southgate Project (issued Feb. 14, 2020), R. 566, JA___ |

xi

| | |
|---|---|
| Erosion Plan | FERC's *Upland Erosion Control, Revegetation, and Maintenance Plan* |
| Extension Order | *Mountain Valley Pipeline, LLC*, Order Granting Extension of Time Request, 185 FERC ¶ 61,208 (Dec. 19, 2023), R. 886, JA___-___ |
| Mainline or Mainline System | Mountain Valley Pipeline, LLC's now-operational 303-mile interstate pipeline located in West Virginia and Virginia, originally approved by FERC in 2017 |
| Mitigation Procedures | FERC's *Wetland and Waterbody Construction and Mitigation Procedures* |
| Mountain Valley | Intervenor for Respondent Mountain Valley Pipeline, LLC |
| Rehearing Order | *Mountain Valley Pipeline, LLC*, Order Addressing Issues Raised on Rehearing, 187 FERC ¶ 61,039 (Apr. 25, 2024), R. 913, JA___-___ |
| Southgate, Southgate Project, or Project | Mountain Valley's 75-mile pipeline project sited in Virginia and North Carolina, approved in the Certificate Order, 171 FERC ¶ 61,232 (2020), R. 601, JA___-___ |

# In the United States Court of Appeals for the District of Columbia Circuit

## Nos. 24-1094 and 24-1150 (consolidated)

_____

APPALACHIAN VOICES, *ET AL.*,
*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

_____

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

_____

## BRIEF OF RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION

_____

## INTRODUCTION AND STATEMENT OF ISSUES

This case concerns a discretionary decision of the Federal Energy Regulatory Commission (FERC or Commission), finding good cause to extend a construction deadline that the Commission had previously set for Mountain Valley Pipeline, LLC (Mountain Valley) to complete the MVP Southgate Project (Southgate Project or Project).

When authorizing construction of jurisdictional natural gas facilities, the Commission typically sets a deadline for completing

1

construction.  No statutory authority requires this deadline or imposes specific requirements on its formulation or extension.  Instead, the Commission establishes and extends these deadlines in case-by-case adjudications, as an exercise of its statutory authority to place terms and conditions on authorized projects.  Under its case-specific approach, which has been affirmed by this Court, the Commission may extend the deadlines it imposes for "good cause" shown.  *See Sierra Club v. FERC*, 97 F.4th 16, 19, 24-25 (D.C. Cir. 2024) (*Northern Access Extension*).

The Commission approved Mountain Valley's Southgate Project in June 2020.  But in that order, which this Court affirmed on review, the Commission recognized that the Southgate Project effectively functioned as an extension of Mountain Valley's Mainline System—that is, the Southgate Project would connect the terminus of Mountain Valley's Mainline System in Virginia to delivery points further south in North Carolina.  Therefore, the Commission determined that it would not issue any notices to proceed with Southgate Project construction until the requisite federal permits had been received for Mainline System construction.  *See Mountain Valley Pipeline, LLC*, 171 FERC ¶ 61,232, at PP 8-9 (2020) (Certificate Order), JA___, *on reh'g*,

172 FERC ¶ 61,261 (2020) (Certificate Rehearing Order), *petition for review denied by Sierra Club v. FERC*, 38 F.4th 220 (D.C. Cir. 2022) (*Southgate*).  Although the Southgate Certificate Order originally set a construction completion deadline of June 18, 2023, permitting issues for the Mainline System were not resolved until that same month.

In the later orders now on review, the Commission determined that Mountain Valley had shown good cause to extend the Southgate construction completion deadline for several more years.  The Commission found it reasonable for Mountain Valley to believe that meeting the original Southgate construction deadline was all but impossible given the Mainline System's permitting delays.

The Commission further explained that it did not need to reopen its past analysis of the market need for the Southgate Project or its analysis of the Project's environmental impacts under the circumstances at issue here.  Petitioners Appalachian Voices *et al.* (collectively, Appalachian)[1] argued that circumstances had materially

---

[1] The Petitioners here are Appalachian Voices, Blue Ridge Environmental Defense League, Center for Biological Diversity, Chesapeake Climate Action Network, Haw River Assembly, Natural Resources Defense Council, Sierra Club, and Wild Virginia.

changed since the Certificate Order authorized the Project in 2020.
But the Commission disagreed that the information presented
amounted to significantly changed circumstances that merited
reconsideration of its prior determinations.

On review, Appalachian raises two issues:

1.  Whether the Commission reasonably granted an extension to
Mountain Valley for good cause shown; and,

2.  Whether the Commission reasonably explained its decision not
to revisit past findings regarding market need for the Project and its
environmental impacts.

## STATUTORY AND REGULATORY PROVISIONS

Pertinent statutes and regulations are contained in the attached
Addendum.

## STATEMENT OF FACTS

## I.    STATUTORY AND REGULATORY BACKGROUND

### A.    Pipeline Certifications Under the Natural Gas Act

The Natural Gas Act, 15 U.S.C. §§ 717-717z, empowers the
Commission to regulate the interstate transportation and sale of
natural gas.  *Southgate*, 38 F.4th at 226.  Section 7(c) of the Act
(15 U.S.C. § 717f(c)) requires that a company seeking to construct new

4

natural gas pipeline facilities obtain a certificate of "public convenience and necessity" from the Commission. *Southgate*, 38 F.4th at 226. If the proposed service "is or will be required by the present or future public convenience and necessity," the Commission will issue a certificate. *Id.* (quoting 15 U.S.C. § 717f(e)). And it may impose "'such reasonable terms and conditions as the public convenience and necessity may require.'" *Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 270 (D.C. Cir. 2015) (quoting § 717f(e)).

In addition, prior to issuing a Natural Gas Act section 7 certificate, the Commission conducts an environmental analysis consistent with the National Environmental Policy Act (NEPA). *See id.* (citing 42 U.S.C. § 4332(2)(C)).

## B. Construction Deadlines for Certificated Pipelines

No provision of the Natural Gas Act specifies a particular time period for completion of a FERC-certificated natural gas pipeline project. *Northern Access Extension*, 97 F.4th at 20. However, the Commission, by order, sets project deadlines to ensure that the information supporting a project certificate has not gone stale and to provide certainty for neighboring landowners and potential competitors.

*Id.* (collecting citations); *see also* 18 C.F.R. § 157.20(b) (providing that any authorized construction "shall be completed and made available for service . . . within [a] period of time to be specified by the Commission in each order").

Under Natural Gas Act section 16, the Commission has broad authority to "perform any and all acts," and to "prescribe, issue, make, amend, [or] rescind" a certificate order as "necessary or appropriate." 15 U.S.C. § 717*o*. Accordingly, and as specified in Commission regulations, FERC may grant extensions of time for "good cause," upon a "motion made before the expiration of the period prescribed or previously extended." 18 C.F.R. § 385.2008(a).

In the pipeline construction context, the good cause standard is judged by the Commission under a "permissibly adopted . . . case-by-case, fact-based approach." *Northern Access Extension*, 97 F.4th at 24. In "examining reasons for delay" of project construction, "FERC has found a wide range of circumstances to support good cause, including legal or litigation-related barriers, as well as impacts from the COVID-19 pandemic." *Id.* at 24-25. Where good cause has been demonstrated, FERC generally grants timely applications for an extension of a

construction deadline.  *Id.* at 24.  Regarding the duration of a possible extension, a certificate holder may request extension of a construction deadline for "a timeframe during which the environmental and other public interest findings underlying the Commission's authorization of the project can be expected to remain valid."  *See id.* at 21 (cleaned up).

Procedurally, such extension requests are generally subject to a public comment period.  *Id.*  Parties aggrieved by a resulting Commission order may apply for agency rehearing, and if rehearing is denied, then seek judicial review.  *Id.* (citing Natural Gas Act section 19, 15 U.S.C. § 717r(a)-(b)).  But in ruling on an extension request, if "there has been no significant shift in the relevant circumstances, FERC generally declines to reevaluate issues that already were addressed when the agency first approved the project."  *Id.* at 25 (Commission "will not consider arguments that re-litigate the issuance of the certificate order" (citation omitted)).

## II.     PROCEDURAL BACKGROUND

### A.     Mountain Valley's Proposed Southgate Project and the Commission's 2020 Certificate Order

On June 18, 2020, the Commission authorized the Southgate Project and issued a certificate of public convenience and necessity.

7

*See* Certificate Order PP 1-2, JA___.  The certificated Project would connect Mountain Valley's Mainline System in Virginia to another pipeline system and to the local distribution facilities of Public Service Company of North Carolina, d/b/a Dominion Energy North Carolina (Dominion), a gas shipper that executed a binding, long-term precedent agreement for 80% of the Project's firm transportation capacity.  *Id.* PP 11 & n.16, 12, 29, JA___-___, ___; *see also* Mountain Valley Certificate Application at 2-4, 7-9, 25, R. 252 (explaining evidence of market need and noting inclusion of Dominion precedent agreement as attachment to initial application), JA___-___, ___-___, ___; 18 C.F.R. § 157.14(a)(12)(i), (v) (requiring submission of market data with a certificate application, including names and locations of customers and any sales or transportation agreements proposed by the application). The certificated route of the Project is indicated in the map below.



Project Environmental Impact Statement (EIS) at 2-2, R. 566, JA___.

### 1.    Market Need for the Project

Under the precedent agreement, Mountain Valley committed to provide Dominion with 300,000 dekatherms per day of transportation service, amounting to four-fifths of the Project's 375,000 dekatherms per day of total design capacity.  Certificate Order PP 1, 40, JA___, ___.[2] The Commission accepted the Dominion precedent agreement as a reliable "showing of need" for the Project.  *Id.* P 40, JA___; *see also id.* PP 51-52 (the Dominion precedent agreement "adequately demonstrates that the project [is] needed"), JA___.  As a condition of authorization, the Commission further required Mountain Valley to indicate that it "has executed contracts for service at the levels provided for in its precedent agreements prior to commencing construction."  *Id.* P 40, JA___.  And the Commission observed that the "project shipper is a local distribution company, which will locally distribute gas to residential, commercial, and industrial end-use customers."  *Id.* P 43,

---

[2] "A dekatherm"—abbreviated as "Dth"—"is a unit of energy used in the natural gas industry that is 'equal to one million British Thermal Units, or over one billion joules.'"  *Fairless Energy, LLC v. FERC*, 77 F.4th 1140, 1144 & n.1 (D.C. Cir. 2023) (citation omitted).

JA___.

As part of this finding, the Commission noted that "[p]rojections regarding future demand" on a regional basis "often change and are influenced by a variety of factors." *Id.* P 41, JA___. Therefore "[g]iven the uncertainty associated with long-term demand projections . . . where an applicant has precedent agreements for long-term firm service, the Commission deems the precedent agreements to be the better evidence of demand." *Id.* P 41 & n.82 (collecting cases), JA___; *see also id.* P 58 (noting that "a primary purpose of the Southgate Project is to serve Dominion's needs"), JA___. The Commission did not require Dominion to explain its reasons for making a "substantial financial commitment" to the Project in its precedent agreement, because the "needs of individual shippers" and their choice of "specific energy resources" to meet those needs are beyond the Commission's purview. *See id.* PP 39, 45 (citing, in part, *RH energytrans, LLC*, 165 FERC ¶ 61,218, at P 21 (2018)), JA___, ___.

## 2. Environmental Impacts of the Project

On agency rehearing in the Certificate Rehearing Order, among other issues, the Commission addressed concerns about the Final

Environmental Impact Statement and the Project's potential for soil erosion that could lead to impacts on aquatic resources. *See* Certificate Rehearing Order PP 27-31, JA___-___. The Commission explained that Mountain Valley was required to follow FERC's *Upland Erosion Control, Revegetation, and Maintenance Plan* (Erosion Plan) and FERC's *Wetland and Waterbody Construction and Mitigation Procedures* (Mitigation Procedures) as modified for the Project, as well as employ environmental inspectors to ensure compliance. *Id.* P 27, JA___-___; *see also* EIS at 2-12 to 2-14 (citing, in part, Mountain Valley Oct. 23, 2019 Application Supplement, R. 524, JA___-___), JA___-___. "Instances of non-compliance at other projects" did not mean that the Erosion Plan, Mitigation Procedures, and other measures would necessarily fail to "provide adequate erosion and sediment control to protect aquatic resources." Certificate Rehearing Order P 28, JA____.

### 3.    Construction Timing for the Project

Finally, in the certificate proceedings, the Commission required Mountain Valley to make the Southgate Project available for service by June 18, 2023. *Mountain Valley Pipeline, LLC*, Order Granting Extension of Time Request, 185 FERC ¶ 61,208, at P 3 (Dec. 19, 2023)

("Extension Order"), R. 886, JA___, *on reh'g*, 187 FERC ¶ 61,039 (Apr. 25, 2024) ("Rehearing Order"), R. 913, JA___.   But the Commission also recognized that the Southgate Project would effectively be an extension of Mountain Valley's Mainline System.  *See* Certificate Order PP 1, 11, JA___, ___-___; *Mountain Valley Pipeline, LLC v. N.C. Dep't of Env't Quality*, 990 F.3d 818, 821 (4th Cir. 2021) (*North Carolina*) (same). Indeed, as of the issuance of the Certificate Order, Mountain Valley did not "currently provide any services subject to the Commission's jurisdiction."  Certificate Order P 3, JA___.  Additionally, at that time, the Mainline System's construction had been suspended and a stop-work order issued after various litigation and permitting issues arose. *See id.* PP 3-10, JA___-___.

Although the Commission found the record sufficient to authorize the Southgate Project under the Natural Gas Act and after NEPA review, it made clear that Commission staff would not allow any Project construction to go forward until the Mainline System's necessary federal permits had been obtained and construction under that certificate had resumed.  *Id.* P 9, JA___; *see also North Carolina*, 990 F.3d at 824  ("Because the Southgate Project depended upon the

Mainline Project, and because the Mainline Project had several of its permits invalidated . . . , FERC would permit construction of the Southgate Project only once [Mountain Valley] acquired all required federal permits for its Mainline Project.").

### B.   This Court's *Southgate* Decision, Affirming FERC Certificate Orders

After the issuance of the Certificate and Certificate Rehearing Orders, six environmental groups petitioned for review in this Court.[3] In that appeal, Case No. 20-1427, the *Southgate* petitioners did not challenge the Commission's finding of market need.  *See Southgate*, 38 F.4th at 227-28 (identifying claims and establishing jurisdiction).  (Even so, this Court observed in rejecting a challenge to the Project's rate structure that "the long-term agreement" with Dominion "shows an actual need for the Project, not an attempt [by] Mountain Valley . . . to overbuild" gas transportation facilities.  *Id.* at 230.)

In contrast, the *Southgate* petitioners did "attack the Commission's Environmental Impact Statement as inadequate"

---

[3] All six petitioners in *Southgate* (Case No. 20-1427) are petitioners again here, joined by two additional organizations, the Natural Resources Defense Council and Wild Virginia.  *Compare* Case No. 20-1427 Docket Sheet *with* Br. i.

regarding mitigation measures related to "sedimentation and erosion." *Id.* at 232. But the Court found "that the Commission discussed potential mitigation measures for erosion and runoff in detail." *Id.* at 232-33 (citing EIS at 1-12, 1-13, 2-19, 2-21, 2-22, 2-30, 4-50, 5-5, JA___, ___, ___, ___, ___, ___, ___, ___). Though NEPA required consideration of mitigation measures, it "does not mandate the form or adoption of any mitigation" activities in particular. *Id.* at 232 (citation omitted). And so the *Southgate* Court found that the Commission's "fulsome" discussion and consideration of mitigation measures—together with the Commission's imposition of monitoring, inspection, and compliance activities—"meets NEPA's mark." *See id.* at 233.

The Court also understood that the Southgate Project "would extend Mountain Valley's Mainline System Project, connecting its terminus in Virginia to facilities in North Carolina." *Id.* at 226. In fact, the Project's "'newness,' as an extension of the" then "non-operational Mainline System Project, [was] one of the prime subjects of dispute" regarding the Project's rate structure. *Id.* at 226, 229-32.

15

### C.    Mountain Valley's Construction Deadline Extension Request

Although the Court's *Southgate* decision issued in 2022, construction on the Mainline System did not resume until late June 2023, by which point the Southgate Project's initial construction deadline had already passed.  *See* Extension Order PP 3-4 (noting that on June 28, 2023, the Commission authorized resumption of Mainline System construction activities), JA___.  On June 15, 2023, shortly before Southgate's original June 18th construction deadline, Mountain Valley requested a three-year extension of time to complete the Southgate Project, primarily due to delays in constructing the Mainline System.  *Id.* PP 1, 3, 5, JA___-___.  In support of its request, Mountain Valley also cited permitting delays for the Southgate Project itself.  *Id.* P 5 & n.13 (citing Mountain Valley Request at 1-2, R. 676, JA___-___), JA___-___.

Good cause existed for an extension, Mountain Valley contended, because of how the Commission had sequenced its approvals of Mountain Valley construction activities.  The Commission had "required construction to resume on the Mainline System before construction of the Southgate Project could commence," yet the

16

Mainline System's federal authorizations had only been ratified and approved days earlier. *See id.* PP 4-5 (citing Request at 1, JA___), JA___-___. Having focused primarily on clearing the way for Mainline System completion, *see id.* P 5 (citing Mountain Valley Aug. 14 Answer at 3, R. 862, JA____), JA____, Mountain Valley sought to resume Southgate Project permitting efforts once Mainline System issues were resolved, *see id.* P 5 & n.16, JA___; Commission Notice of Request for Extension of Time at 2 & n.4, R. 678, JA___; *see also* Extension Order P 5 n.13 (explaining that the Southgate Project's North Carolina water quality certification was denied in 2021 with reference to "the status of the Mainline Project"), JA___.

By the close of a month-long comment period, the Commission received numerous public comments on the extension request. Extension Order PP 6, 8, JA___-___. Supporters included Mountain Valley's original customer—Dominion—as well as electric utility Duke Energy Carolinas, LLC (Duke Carolinas), both of which emphasized the fuel diversity and security benefits of the Project. *See id.* PP 8, 16-17 & n.53, JA___, ___-___; *see also* Dominion Comments, R. 697, JA___-___;

Duke Comments, R. 762, JA___-___.[4]  Opponents (including

Appalachian's members) disputed that there was good cause for an

extension of time given Southgate's permitting status and litigation

history.  They also claimed that the Certificate Order's market need and

environmental analyses were no longer valid given changed

circumstances.  *See* Extension Order PP 12, 16, 18, 24-25, JA___-___,

___-___, ___, ___-___.

### D.   The Commission Orders on Review

#### 1.   The Extension Order

In the Extension Order, the Commission found good cause to

grant Mountain Valley's requested extension.  It explained that under

Commission policy, it reviews extension requests "on a case-by-case

basis" and will generally "grant extensions of time when a project

sponsor demonstrates that good faith efforts to meet a deadline have

been thwarted," including with respect to permitting issues.  *Id.* P 14,

JA___.  Mountain Valley met that standard, the Commission found,

because the Commission required that the Mainline System's

---

[4] Duke Carolinas later indicated that it had also entered into a precedent agreement with Mountain Valley.  *See* Duke Mot. to Intervene at 2-3, 5-6, Case Nos. 24-1094 & 24-1150, ECF No. 2059999.

development proceed first and that effort had encountered significant delays. *See id.* P 15, JA___-___. In fact, the Commission found it "reasonable for Mountain Valley to . . . expect that it was all but impossible to meet the Certificate Order's in-service date . . . of June 18, 2023" when, only earlier that month, the Mainline System's construction "was jumpstarted by the passage of the Fiscal Responsibility Act of 2023." *See id.*; *see also id.* PP 4-5 (Act signed into law on June 3, 2023), JA___-___.

The Commission also found that its market need and environmental impact conclusions remained valid. The issues raised by commenters did not amount to "significant changes" undermining these conclusions since the Project was supported by a long-term precedent agreement for 80% of its capacity and only the timing—and not the nature—of the Project was all that was before the Commission. *Id.* PP 17, 19, JA___-___. Regarding commenters' environmental concerns about the Mainline System's erosion and sedimentation events, the Commission disagreed that these concerns amounted to significant pieces of new information or that those issues would necessarily recur during Southgate Project construction. *Id.* PP 25-26,

19

JA\_\_\_-\_\_\_.  And the Commission reviewed the cited Virginia state agency environmental reports on the Mainline System's erosion and sediment control issues and found that the impacts described therein were not significant.  *Id.* P 27, JA\_\_\_.

### 2. Rehearing Request and Mountain Valley's Project Update

Appalachian requested agency rehearing of the Extension Order, raising many of the same concerns advanced in prior comments.  *See* Reh'g Request at 19-31, R. 898, JA\_\_\_-\_\_\_.[5]  But Appalachian also raised new concerns regarding a project update that Mountain Valley submitted after the Extension Order issued.  *See id.* at 9-19, JA\_\_\_-\_\_\_.

On December 29, 2023, Mountain Valley informed the Commission that, after further discussion with Southgate's intended customers, it had entered into new precedent agreements for nearly double the amount of gas transportation service that had previously been agreed to.  Rehearing Order P 7 (citing Project Update Letter at 1, R. 889, JA\_\_\_), JA\_\_\_.  Instead of contracting for 300,000 dekatherms

---

[5] Appalachian also raised arguments about potential impacts on threatened species, which the Commission addressed in the Rehearing Order.  *See* P 20, JA\_\_\_.  However, Appalachian has not maintained those arguments on appeal.  *See* Br. 51-57.

per day of firm transportation service, project shippers had signed agreements for a total of 550,000 dekatherms per day of service. *Id.* PP 3, 7, JA___-___. This development meant that the parties "contemplate a redesigned project (in lieu of the original project)," *see id.* P 7, JA___, as the certificated Project would provide only up to 375,000 dekatherms per day of service, *id.* P 3, JA___.

More specifically, and in combination with other certificated facilities, the original Project would consist of around 31.2 miles of 24-inch-diameter natural gas pipeline running from Pittsylvania County, Virginia, southwest to Rockingham County, North Carolina, plus another 43.9 miles of smaller pipeline that would continue on in a southeastern direction to Alamance County, North Carolina. *See* Certificate Order at P 11, JA___-___; *supra* p. 9 (presenting map).

But a redesigned Project would be expected to traverse only part of the original path. A redesigned Project would instead consist of approximately 31 miles of larger, 30-inch diameter pipeline running from Pittsylvania County, Virginia, southwest "to planned new delivery points in Rockingham County, North Carolina." *See* Rehearing Order P 7, JA___-___. It would not extend further toward Alamance County.

21

*See id.* Mountain Valley illustrated this contemplated new extent of the

Project for potential shippers as indicated below.



Mountain Valley Pipeline, LLC, *Southgate Project Non-Binding Open*

*Season Announcement* (dated Feb. 2, 2024), *available at*

https://perma.cc/DE7T-MTQH; *see also supra* p. 9 (map depicting

certificated Project route).

22

Appalachian contended on agency rehearing that this project update meant that Mountain Valley had "expressly abandoned any intention of building the project" the Commission certificated, and so the Commission's good cause finding in the Extension Order was arbitrary and capricious. *See* Reh'g Request at 12-13, JA___-___. In Appalachian's view, Mountain Valley had failed to "actively pursue" the certificated Project and was working towards a different project instead, which Appalachian believed should result in setting aside the Extension Order. *See id.* at 8, JA___.

But Appalachian acknowledged that Mountain Valley had not yet asked the Commission to amend the Project's certificate. *See id.* at 11 (noting that the "Commission has not been asked to" analyze a redesigned Project), JA___. Appalachian further acknowledged that plans for the potential redesign of the Project remained too indefinite for the Commission to undertake a full review of it under the Natural Gas Act or NEPA. *See id.*

### 3.    The Rehearing Order

On rehearing of the Extension Order, the Commission sustained its findings that the Project continued to meet a market need and that

23

evidence of impacts to soil and aquatic resources arising since the Certificate Order did not warrant denying a construction deadline extension. Rehearing Order P 10 & nn.25-26 (citing, in part, Extension Order PP 16-17, 24-27, JA___-___, ___-___), JA___-___. It sustained its finding that Mountain Valley demonstrated good cause for an extension, given the difficulties encountered in completing construction of the Mainline System. *Id.* P 10 & n.24 (citing, in part, Extension Order PP 14-15, JA___-___), JA___-___.

The Commission also explained that Appalachian's argument regarding the project update proceeded from a mistaken premise. That is, Appalachian incorrectly asserted that "by contemplating redesign of the project, Mountain Valley is abandoning it." *Id.* P 13, JA___. Mountain Valley's statements were to the contrary, the Commission explained, and it was not unusual or incompatible for a project sponsor to contemplate a project amendment as well as to seek a construction deadline extension. *Id.* PP 13-15 & nn.36-37 (collecting cases), JA___-___.

The Commission further rejected the practical import of Appalachian's argument, explaining that Mountain Valley should not

be required to apply for a new certificate to account for a potentially redesigned Project. Instead, "a certificate amendment would be the appropriate means to account for any changes to the project as previously certificated." *Id.* P 10 n.24, JA___. It was sufficient, the Commission found, that Mountain Valley continued to have precedent agreements covering "not only the majority of the capacity of the original certificated project but also the increased capacity of the revised project." *Id.* P 16, JA___. And the Commission made clear that any certificate amendment application Mountain Valley might submit in the future would be evaluated under the relevant standards of the Natural Gas Act and NEPA. *Id.* PP 16, 18-19, JA___-___.

## SUMMARY OF ARGUMENT

The Commission's decision to extend Mountain Valley's construction deadline lies soundly within the agency's administrative discretion under the Natural Gas Act. No statutory authority dictates any deadline by which authorized natural gas projects must be completed. The Commission instead has broad discretion to set construction deadlines based on its assessment of project-specific circumstances. By the same token, the Commission also has discretion

to extend those deadlines when they become infeasible due to project-specific circumstances encountered by the project sponsor, such as permitting difficulties.  In such cases, the Commission may extend construction deadlines for "good cause" shown.

Here, the Commission reasonably exercised its administrative discretion to find that Mountain Valley satisfied the good cause standard.  Consistent with agency direction, Mountain Valley focused its efforts on Mainline System construction, the permitting status of which was uncertain until June 2023.   Mountain Valley was not able to meet that month's Southgate construction deadline as a result.  This satisfied the Commission's good cause standard, consistent with prior cases.  Appalachian provides no valid reason to disturb that conclusion.

Although Appalachian claims that circumstances had changed since the Commission originally authorized the Southgate Project, the only notable change does not support Appalachian's arguments. Mountain Valley anticipates providing even *more* gas transportation service than previously planned, and it is contemplating Project designs that will accomplish that goal.  The Commission interpreted these facts as reflecting a good faith effort toward Project completion, and not

representing abandonment of the Project's certificate or signs of reduced consumer demand. And Appalachian's ostensibly new evidence that it offered in support of reopening the Commission's detailed study of the Project's environmental impacts was neither novel nor significant.

The challenged orders readily satisfy the Administrative Procedure Act's reasonable explanation requirement. The Commission appropriately relied on Mountain Valley's explanation of the circumstances, placed those circumstances within the context of other extension cases, and justified its "good cause" finding on the specific facts presented. It further explained why Appalachian was incorrect in arguing that the relevant market and environmental circumstances had significantly changed since initial Project authorization. No more was required.

## ARGUMENT

## I.    STANDARD OF REVIEW

The Commission exercises considerable discretion when it sets and revises pipeline construction deadlines. Because such deadlines are imposed on individual projects via Commission order—and are not dictated by statute or even by regulation—"FERC's discretion in granting an extension of time for a natural-gas construction project is

27

limited only by the arbitrary-and-capricious standard of the

Administrative Procedure Act." *Northern Access Extension*, 97 F.4th at

23 (citing 5 U.S.C. § 706(2)(A)).

Review of agency action under the arbitrary and capricious

standard is narrow; agency action will be upheld as long as it is

"reasonable and reasonably explained." *FCC v. Prometheus Radio

Project*, 592 U.S. 414, 423 (2021). The agency's "regulatory decision"

does not need to be "the best one possible" or even "better than the

alternatives" to be upheld. *Northern Access Extension*, 97 F.4th at 23

(quoting *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016)).

Rather, "if the Commission has examined the relevant considerations

and articulated a satisfactory explanation for its action," the standard is

satisfied. *Id.* (cleaned up and citation omitted).

Also, this Court grants "substantial deference" to Commission

decisions that involve regulatory policy judgments and the parameters

set by its own orders. *See LSP Transmission Holdings II, LLC v.

FERC*, 45 F.4th 979, 1000 (D.C. Cir. 2022) (quoting *Sacramento Mun.

Util. Dist. v. FERC*, 616 F.3d 520, 533 (D.C. Cir. 2010)). It grants

deference on issues that demand the Commission's technical and

scientific expertise, including those involving environmental analysis.

*Southgate*, 38 F.4th at 235 (citing *Myersville Citizens for a Rural Cmty.,*

*Inc. v. FERC*, 783 F.3d 1301, 1308 (D.C. Cir. 2015)).  Thus, for fact-

specific claims involving either the Natural Gas Act or NEPA, the Court

will affirm the Commission's judgment if it is "either consistent with

past practice" or "adequately justified" as a product of reasoned

decision-making.  *See id.* at 228 (citations omitted).

## II.   THE COMMISSION REASONABLY GRANTED AN EXTENSION OF THE COMMISSION-IMPOSED DEADLINE FOR PROJECT CONSTRUCTION

### A.   The Commission Reasonably Found that Mountain Valley Satisfied the "Good Cause" Standard Consistent with *Northern Access Extension*

#### 1.   Construction Deadlines and Related Extensions of Time Are Matters of Agency Discretion

The Natural Gas Act does not establish any deadline for the

recipient of a section 7 certificate to complete construction and place a

pipeline facility into service.  Instead, it is within the Commission's

discretion to establish an appropriate deadline for completion of

construction.  *See* 18 C.F.R. § 157.20(b) (providing that any authorized

construction take place within a "period of time to be specified by the

Commission in each order").  The Commission exercises that discretion

by assessing the "circumstances relevant to the specific project" and by determining a "reasonable period of time" to complete construction and put the project in service.  Extension Order P 11, JA___.

A project's initial construction deadline will generally be extended when "good faith efforts" to meet the deadline "have been thwarted." *Id.* P 14, JA___.  Extensions are granted, however, on a case-by-case basis.  *Id.*  In reviewing the length of a proposed extension, the Commission considers whether the "total period of time ultimately allowed" for construction is reasonable and whether during that period "the findings supporting [the] original certificate authorization can be expected to remain valid."  *Id.*

These general principles were recognized and applied by this Court in *Northern Access Extension*.  97 F.4th at 24-25.  Here, Appalachian does not appear to dispute the governing legal standard. *See* Br. 25-26, 26-27 (citing Extension Order P 11, JA___, and *Northern Access Extension*, 97 F.4th at 24-25).  Rather, Appalachian contends that the standard was not met under the particular factual circumstances present here.  *See id.* 26.

### 2. The Commission Reasonably Found that Good Cause Exists Here

In line with several past extension cases, and after close review of the relevant facts, the Commission found it reasonable to grant Mountain Valley's extension request. Extension Order PP 14-15, JA___-___. Past project sponsors have encountered litigation or permitting-related delays in completing project construction. *Id.* P 14 & n.44 (collecting cases, including *Nat'l Fuel Gas Supply Corp.*, 179 FERC ¶ 61,226 (2022) (granting 35-month extension given litigation delays), *petition for review denied by Northern Access Extension*, 97 F.4th 16), JA___. Under those circumstances, the Commission has found that extending a construction deadline for approximately two or three years is reasonable. *See id.* (citing *Const. Pipeline Co., LLC*, 165 FERC ¶ 61,081 (2018) (granting two-year extension given permitting efforts); *Arlington Storage Co., LLC*, 155 FERC ¶ 61,165 (2016) (same)).[6]

---

[6] Indeed, longer extension periods or successive extension requests have been found reasonable under the circumstances of individual cases. *See, e.g.*, *Delfin LNG LLC*, 181 FERC ¶ 61,144, at PP 1-5, 18 (2022) (noting extensions of time that amounted to four additional years); *Port Arthur LNG, LLC*, 181 FERC ¶ 61,024, at PP 1-3 (2022) (granting extension of time of over four additional years); *Trunkline Gas Co., LLC*, 179 FERC ¶ 61,086, at PP 1-4 (2022) (noting prior extensions

In these cases, the Commission considers whether good faith efforts were made toward project completion; it does not second-guess an applicant's reasonable response to adverse permitting developments. *See, e.g., Constitution*, 165 FERC ¶ 61,081 at P 14 (finding that applicant "is free to decide how to satisfy" its obligations, including making choices about permitting-related litigation), *on reh'g*, 169 FERC ¶ 61,102, at P 21 (2019) (same); *PennEast Pipeline Co., LLC*, 170 FERC ¶ 61,138, at PP 7, 10 (2020) (same regarding "tactical choices" in seeking to obtain permits); *see also Northern Access Extension*, 97 F.4th at 25 (reviewing Commission orders and concluding that "sponsors typically can meet the 'good cause' standard by demonstrating their diligence and citing factors beyond their control that have slowed their progress").

Here, the Commission decided to withhold further Southgate construction authorizations until Mainline System permitting issues had been resolved.  *See* Extension Order P 15, JA___.  Mountain Valley therefore "prioritized its efforts on the Mainline System," which had to

---

of time in granting an additional three years for completion of construction).

come first. *See id.* This was "not evidence of bad faith" as some

contended, but a realistic response to the sequencing of construction

authorizations, especially in light of the difficulties that Mountain

Valley encountered in completing the Mainline System. *See id.* P 15,

JA___-___.

Under these facts, the Commission found that Mountain Valley

made a good faith effort to meet the Southgate construction deadline,

"but encountered circumstances that prevented it from doing so." *Id.*

P 15, JA___. This finding, rooted in the Commission's interpretation of

its own orders, is "properly confided to [its] judgment," and should be

afforded "substantial deference." *See Sacramento Mun. Util. Dist.*, 616

F.3d at 533; *see also Northern Access Extension*, 97 F.4th at 29

(rejecting petitioner argument calling for an "unduly high level of

stringency in determining good cause" since "FERC enjoys broad

discretion" in this regard).

B.    **Appalachian's Arguments that Mountain Valley Abandoned the Project or Failed to Advance It Are Unavailing**

1.    **Appalachian Misconstrues Mountain Valley's Anticipated Redesign of the Project as a New Project**

Appalachian criticizes the Commission's finding of good cause on these facts. Its principal argument is that Mountain Valley "abandoned efforts to secure permits and property rights for the certificated project" because it would rather "pursue a markedly different project" instead. Br. 26; *see also id.* 26-39 (elaborating on this argument). Appalachian suggests that Mountain Valley's focus on the Mainline System is an "excuse" for its alleged "lack of progress," and one that "no longer applied" to explain Mountain Valley's Southgate Project efforts after its project update. *See id.* 29-30.

This argument is based on a faulty premise. Appalachian contends that the anticipated redesign of the Southgate Project is "a different project," one that is "substantially different" such that Mountain Valley "does not plan to build" Southgate at all. *Id.* 30.

But the Commission put this mistaken notion to rest in the Rehearing Order when it "disagree[d]" that "by contemplating redesign of the project, Mountain Valley is abandoning it." Rehearing Order

34

P 13, JA\_\_\_.  Project sponsors often propose to amend their certificated

projects, and that practice is fully compatible with seeking and granting

extensions of construction deadlines.  *Id.* P 15 & nn.36-37 (collecting

cases), JA\_\_\_.  No amendment application had been filed and any

forthcoming amendment here, if proposed in sufficient detail in an

application to the Commission, will be evaluated under the relevant

Natural Gas Act and NEPA standards.  *Id.* PP 14, 16, JA\_\_\_, \_\_\_.

Also, none of Mountain Valley's statements indicated that it has

decided to abandon its certificate or its intent to provide gas

transportation service to Dominion and others.  To the contrary,

Mountain Valley anticipates providing even *more* gas transportation

service than previously, and is contemplating facility designs that will

accomplish that goal.  *See id.* P 13, JA\_\_\_.  Under these circumstances,

and given that the Commission had no specific amendment proposal yet

before it, the Commission reasonably found that it could act on a

request to extend the existing authorization it had issued.

Much of what Appalachian contends in this vein is based on its

misunderstanding of the project amendment process.  It accuses

Mountain Valley of inaction, delay, and misdirection, *see* Br. 26, 29-32,

35

and concludes that under these alleged circumstances the Commission should have "directed Mountain Valley to file a new certificate application" instead of seeking an extension pending a project amendment.  *Id.* 38-39; *see also id.* 39 ("failure to do so was arbitrary, capricious, and an abuse of discretion").

But this argument ignores that, as the Commission explained, "a certificate amendment would be the appropriate means to account for any changes to the project" of the kind at issue here.  Rehearing Order P 10 n.24, JA___-___; *see also id.* PP 13-16 (explaining that "Appalachian Voices has not demonstrated that the Commission should set aside the Extension Order"), JA___-___.  That is, to the extent that Mountain Valley will seek to amend its existing Southgate Project certificate, it would be appropriate to make that proposal in the same Commission proceeding rather than begin anew.  *See* Rehearing Order P 10 n.24, JA___-___.  This conclusion was based on substantial evidence.  *See, e.g.*, *id.* PP 7, 13 (summarizing and reviewing the Project Update, JA___-___), JA___-___, ___.  It was reasonably explained and consistent with Commission practice and precedent.  *Id.* PP 15-16, JA___; *see also infra* pp. 42-43 (discussing cited precedents).  And the

36

Commission receives substantial latitude in deciding what administrative processes are appropriate in any given situation. *Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211, 230 (1991) (explaining that the Commission "enjoys broad discretion in determining how best to handle related, yet discrete, issues in terms of procedures, and priorities" (citations omitted)).

Accordingly, the Commission's conclusion merits respect. *See Northern Access Extension*, 97 F.4th at 23-25; *see also Minisink Residents for Env't Pres. & Safety v. FERC*, 762 F.3d 97, 101, 108, 114-16 (D.C. Cir. 2014) (denying petitions for review after finding that the Commission's conclusions regarding a project sponsor's future intentions and the Commission's "procedural calls along the way" to a decision were "both reasonable and reasonably explained").

### 2. Appalachian Underappreciates the Southgate Project's Dependence on the Mainline System

Appalachian also contests the Commission's finding that it was reasonable for Mountain Valley to prioritize Mainline System construction efforts. It claims that the Commission ignored arguments about Mountain Valley's lack of Project permitting progress, including

37

in the period after Mainline System permitting issues had been resolved.  *See* Br. 26-29.

The Commission squarely addressed these concerns.  As noted above, it found the Certificate Order's June 18, 2023 deadline to be "all but impossible" under the circumstances.  *See* Extension Order P 15, JA___-___.  The Commission found that prioritization of the Mainline System and its permitting efforts reflected a good faith effort to meet the construction deadline, even if, in the end, Mountain Valley was prevented from meeting it due to the Mainline System's delays.  *See id.* And as the Commission's orders further explained, Mountain Valley had not expressed an intent to abandon the Project; it instead indicated that it intended to move ahead toward Project completion. *See* Rehearing Order PP 5, 10 & n.24, 13, JA___-___; Extension Order PP 5, 14-15, JA___-___, ___-___.

Appalachian would prefer for the Commission to second-guess Mountain Valley's permitting process decisions and disregard its intent to continue pursuing the Project.  *See* Br. 28-29.  But the Commission declined to draw such speculative inferences here, consistent with its approach in past cases.  *See supra* pp. 31-32 (addressing Extension

38

Order P 14 & n.44, JA____ and cited cases); *Northern Access Extension*, 97 F.4th at 27 ("FERC may decide, in its discretion, that other types of reasonable efforts, other than 'active pursuit' of all permits, are sufficient.").

Significantly, two facets of this case distinguish the challenged orders from past Commission proceedings where project sponsors merely sat idle while a deadline approached. The first is the dependence of the Southgate Project on the Mainline System, and the second is the demonstrated and continued interest of prospective shippers in the Southgate Project. *Compare* Br. 29 *with Arlington Storage Co., LLC*, 155 FERC ¶ 61,165 at PP 9-11 (granting extension of time given property rights acquisition, even though project sponsor had "no precedent agreements for project service") *and Chestnut Ridge Storage LLC*, 139 FERC ¶ 61,149, at P 11, 24, 26 (2012) (denying extension of time and vacating certificate given lack of necessary property rights *and* lack of customer commitments or financial viability under current conditions); *see also Leaf River Energy Center LLC*, 156 FERC ¶ 61,015, at P 3-4 (2016) (finding that a project sponsor's simple desire to wait for "more favorable market conditions to develop" does

39

not by itself suffice for good cause). Under the circumstances here—an inability to proceed despite continued customer interest—the Commission found it appropriate to grant more time for Mountain Valley to pursue required permits and authorizations, a result consistent with the cases cited by Appalachian. *See* Extension Order PP 14-15 & nn.42-45, JA___-___.

### 3. Appalachian's Attempts to Distinguish Past Commission Orders Are Not Persuasive

Finally, Appalachian contends that the Commission's approach to potential project amendments was "unfounded" and that past Commission orders do not support the conclusions reached here. *See* Br. 33-39.

These contentions are misplaced. The Commission recognizes the importance of setting construction deadlines, as reflected in both the challenged orders and in prior cases. *See Northern Access Extension*, 97 F.4th at 20. That is why the Commission has imposed a good cause standard in considering deadline extension requests. *See id.* (citing informational concerns and certainty for affected parties); *see also* Extension Order P 11 (noting the good cause standard and citing, in part, *Adelphia Gateway, LLC*, 178 FERC ¶ 61,030, at P 15 (2022)),

40

JA___.  If a project sponsor demonstrates good faith efforts to meet its deadline but has encountered circumstances preventing it from meeting that deadline, an extension is likely justified.  *See id.*  Without such a showing, an extension of time request will likely be denied. *See Northern Access Extension*, 97 F.4th at 25 n.4 (collecting denial examples).

This standard ensures that the relative interests of the parties are appropriately weighed.  *See id.* at 20.  Additionally, the Commission considers any information that may be new or different from the record on which a certificate was granted, which ensures current and timely decision-making.  *See* Rehearing Order P 18, JA___.

Therefore, Appalachian is wrong to suggest that the relevant information here has become "dated" or that landowner interests have been unfairly compromised.  *See* Br. 33-34.  The Commission's good cause finding here was detailed in the orders on review, and the Commission fully responded to Appalachian's arguments. *See* Rehearing Order PP 10, 13-14 (citing, in part, Extension Order PP 14-15, JA___-___), JA___-___; *see also infra* pp. 43-62 (regarding allegations of changed circumstances).  No more was required.

Appalachian also missteps when it suggests that only "a minor adjustment" to a project can be paired with an extension request. *See* Br. 35-38. None of the cited cases limited their reasoning to what Appalachian believes are "minor" amendments; each one involved or anticipated an applicant-designed request to change the nature of certificated facilities. Taken together, these cases reflect that amendments and extensions of time are distinct requests that may be considered either together or separately. *See PennEast Pipeline Co., LLC*, 170 FERC ¶ 61,138, at PP 7-8, 16-19 (2020) (granting extension of time and noting possible forthcoming amendments); *Algonquin Gas Transmission, LLC*, 174 FERC ¶ 62,179, at PP 12-20 (2021) (delegated order issued by Commission staff granting both a project amendment and extension of time without protest); *Mountain Valley Pipeline, LLC*, 179 FERC ¶ 61,013, at PP 4 n.6, 13-15, 153-156 (2022) ("Mainline Amendment Order") (granting project amendment and noting previous extension of time granted by 173 FERC ¶ 61,026 (2020)). The Commission reasonably concluded from these precedents that "the prospect that the project may be amended in the future" is not a reason to deny an extension of time now. *See* Rehearing Order P 15, JA___.

42

Furthermore, the argument Appalachian advanced on agency rehearing was that Mountain Valley had effectively abandoned the Southgate Project, making a potential certificate amendment unwarranted.  *See* Rehearing Order PP 11-16 (citing, in part, Reh'g Request at 9-12, JA___-___), JA___-___.  As noted above, the Commission rejected that notion, explaining that: 1) project amendments are common; 2) the possibility of later amendments does not impact the good cause analysis of an extension request; and 3) any such amendment proposal here would be studied in due course under the relevant statutory standards, assuming adequate information is presented.  *See* Rehearing Order PP 15-16, JA___.  The Commission's conclusions were therefore reasonable and reasonably explained.

*See Minisink Residents*, 762 F.3d at 101.

## III.  THE COMMISSION REASONABLY EXPLAINED WHY IT DECLINED TO REVISIT ITS PAST ANALYSES OF THE PROJECT'S MARKET NEED AND ENVIRONMENTAL IMPACTS

### A.  Past Decisions May Be Reopened Only Upon Identification of Significant New Information or Circumstances

The Commission also declined to revisit its past conclusion that there was a demonstrated market need for the Project and its analysis

43

of the Project's environmental impacts.  *See* Rehearing Order PP 10 &

nn.25-26, 18-19 (citing Extension Order PP 16-17, 24-27, JA___-___,

___-___), JA___, ___-___.  Appalachian challenges the explanations

given, but both conclusions were reasonable and reasonably explained.

As this Court noted in *Northern Access Extension*, the Commission

has adopted a "forward-looking policy" that avoids "duplicating the

extensive work . . . done when granting the certificate."  97 F.4th at 25-

26.  It generally does not entertain challenges to "the findings and

reasoning underlying the certificate order" when only an extension of

time request is pending.  *See id.*  Therefore, commenters must raise

"new information or circumstances that post-date the certification

process" before the Commission will revisit its prior analyses when

ruling on an extension of time.  *See id.*; Rehearing Order P 18, JA____.

Notably, Appalachian does not appear to dispute the legal

standard that applies here.  *See* Br. 42-43 (citing, in part, *Northern*

*Access Extension*, 97 F.4th at 25-26).  Also important is that the

petitioners in the prior *Southgate* appeal did not challenge the

Certificate Order's market need findings, and the relevant challenges

they made to the Commission's environmental analysis failed.

44

*See* 38 F.4th at 226, 227, 228-232 (noting that "the long-term agreement shows an actual need for the Project"); *id.* at 232-35 (accepting as reasonable the Commission's environmental analysis of erosion, sediment control, and aquatic resource issues).

Appalachian thus must rely on new information or developments that amount to "a significant change in circumstances" from the Certificate Order. *Northern Access Extension,* 97 F.4th at 26. And the Commission's determination here "is entitled to substantial deference" as it "necessarily relies on the Commission's technical expertise." *Id.* (citing *Sacramento Mun. Util. Dist.*, 616 F.3d at 533).

### B. The Commission Reasonably Explained Why It Declined to Revisit Its Market Need Analysis

#### 1. Demand for the Project's Services Only Increased

Appalachian contends that the Commission was required to reassess the "market need for, and thus public benefits of" the Southgate Project given a purported "fundamental change in circumstances" since the Certificate Order. *See* Br. 47.

The identified change in market circumstances, however, is that there is now a *greater* demand for gas transportation than before—Mountain Valley now has precedent agreements with two shippers for a

45

total of 550,000 dekatherms per day of gas transportation, not just

300,000. *See* Rehearing Order PP 3, 5, 7, 10 n.25, 13, JA___-___.

Mountain Valley's agreements are not for a different project; one is with

the same shipper as before (Dominion), the other is with another utility

in North Carolina (Duke Carolinas), and they relate to a potential

redesign of a substantial portion of this same Southgate Project to

provide more service. *See id.* PP 7, 13-16, JA___-___, ___-___; *supra*

pp. 18 n.4, 20-22. Given these facts, the Commission disagreed that

this potential future redesign of the Project indicated "a lack of

continued market need" that necessitated reweighing the Project's

benefits and impacts. Rehearing Order PP 9-10, JA___-___.

Appalachian assumes that the Commission was required to agree

with its narrow and formal view of the agreements. It claims that

because the prior Dominion agreement was "superseded" and because

Mountain Valley did not supply "precise" new details regarding a

potential redesign of the Project, any market need conclusion besides

Appalachian's must be arbitrary. *See* Br. 46.

But the Commission faced a "technical inquiry properly confided

to [its] judgment" in considering whether the circumstances "change[d]

46

substantially enough to revisit its underlying findings." *Northern Access Extension*, 97 F.4th at 28 (cleaned up and citation omitted). The Commission was not wrong to focus its inquiry on shipper demand, and it was entitled to credit statements from shippers and Mountain Valley about continued demand for the Project's services. *See* 18 C.F.R. § 385.2005(a)(2)(ii) (a signed filing submitted to the Commission certifies that "[t]he contents are true as stated, to the best knowledge and belief of the signer"). And Mountain Valley is required, as a condition of Project authorization, to have executed service contracts with shippers "prior to commencing construction." *See* Certificate Order P 40, JA___; *see also Mountain Valley Pipeline, LLC*, Delegated Letter Order (issued May 24, 2024) (FERC Docket No. RP24-708-000) (accepting tariff records reflecting several such contracts for the now-operational Mainline System).[7] That requirement, which is

---

[7] FERC eLibrary Accession No. 20240524-3014, *available at* https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20240524-3014&optimized=false; *see also Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043, at P 10 (2017) (noting precedent agreements for the Mainline System in granting a certificate).

47

commonplace in Commission certificate orders,[8] further ensures that shipper demand supports the Project before construction begins.

The question posed to the Commission on agency rehearing was whether circumstances indicated a "lack of continued market need." Rehearing Order P 10, JA___-___.  Or, as Appalachian acknowledges, the question was what the circumstances indicated about demand for Southgate's services.  *See* Br. 47 (citing *Northern Access Extension*, 97 F.4th at 28); *see also* Reh'g Request at 23-24 & n.77 (alleging an "ongoing decline of demand for natural gas in the [relevant] markets" and that precedent agreements "no longer . . . support a determination of market need"), JA___-___.  But those circumstances included precedent agreements with nonaffiliated shippers for a substantial portion of Project capacity which, under Commission precedent, adequately demonstrate customer demand.  *See* Rehearing Order P 10 n.25 (citing Extension Order P 17, JA___), JA____; *see also* Certificate

---

[8] *See, e.g., ANR Pipeline Co.*, 179 FERC ¶ 61,122, at ordering para. (B) (2022); *Gulf South Pipeline Co., LP*, 170 FERC ¶ 61,201, at ordering para. (B) (2020); *Natural Gas Pipeline Co. of Am. LLC*, 169 FERC ¶ 61,050, at ordering para. (B) (2019); *National Grid LNG LLC*, 165 FERC ¶ 61,031, at ordering para. (B) (2018).

USCA Case #24-1150    Document #2078103    Filed: 10/03/2024    Page 62 of 99

Order PP 39-41 (explaining that it is "well established that precedent agreements are significant evidence of demand for a project" in general, and for Southgate in particular), JA___-___.

With the "objective existence of a market need" established, the Commission did not need to probe further into "the precise mechanics of fulfilling that need" and various other contingencies. *See Twp. of Bordentown v. FERC*, 903 F.3d 234, 244, 251, 262-63 (3d Cir. 2018) (rejecting a "myopic" market need argument that discounted the weight of a precedent agreement and engaged in speculation about an intended customer's plans and motives).

### 2.    Appalachian's Other Contentions Lack Merit

Despite this, Appalachian faults the Commission for not conducting another "extensive analysis of market need" considering all possible issues. *See* Br. 46-50 (quoting *Northern Access Extension*, 97 F.4th at 20). But that was not required here in ruling on an extension of time request; the Commission's forward-looking policy, as affirmed by this Court, does not require a second "balancing of interests," *see* Br. 46, or particularly detailed findings, *see id*. 47-48. That sort of analysis is required at the certificate-granting stage and it has already occurred

49

regarding the judicially-upheld Southgate Project. *See Northern Access Extension*, 97 F.4th at 20; *see also* Certificate Order PP 29-52, JA\_\_\_-\_\_\_; *Southgate*, 38 F.4th at 230. Only where significantly changed circumstances have arisen since that analysis does the Commission need to cover the same ground again. *See Northern Access Extension*, 97 F.4th at 25-26, 28.

The Commission understood this standard and applied it in reviewing the allegedly new information Appalachian put forward. It found that none of those matters "undermine the Commission's previous finding that the project is needed." Extension Order P 17, JA\_\_\_; *see also* Rehearing Order P 10 n.25 (sustaining this finding and also distinguishing *Envt'l Def. Fund v. FERC*, 2 F.4th 953, 976 (D.C. Cir. 2021)), JA\_\_\_. It found that high-level gas usage statistics, the recent passage of new laws, and other developments cited by Appalachian also did not amount to significantly changed circumstances. *Compare* Br. 49-50 & n.15 *with* Rehearing Order P 10 n.25 (citing Extension Order P 17, JA\_\_\_), JA\_\_\_. And it cited a past order that explained how the Commission could not meaningfully determine whether individual projects will comply with emissions goals

or laws set by other authorities.  *See* Extension Order P 17 (citing *Northern Natural Gas Co.*, 184 FERC ¶ 61,186, at PP 61-62 (2023)), JA___; *see also N. Nat. Gas Co.*, 186 FERC ¶ 61,064, at PP 29-30 (2024) (same).

With the market need for the Project established by precedent agreements, the Commission found no need to extensively discuss these other developments.  This was reasonable, as the factors shaping the market need for gas transportation capacity had been extensively discussed by the Commission before.  *See* Certificate Order PP 29-52, JA___-___.  In that discussion, the Commission explained that it did not question the shipper's reasons for desiring additional gas capacity, nor would it opine on which energy resources should meet which end-use customer needs.  *See id.* PP 39 & n.80, 45 & n.89 (noting that the "Commission cannot require individual energy users to use different or specific energy resources"), JA___, ___; *see also City of Oberlin, Ohio v. FERC*, 937 F.3d 599, 605-06 (D.C. Cir. 2019) (recognizing Commission policy in this regard); *contra.* Br. 48 (asking for discussion of "specific demand" for the Project's gas by "end use" customers).

51

And if for some reason the intended shippers unwisely entered into precedent agreements, the Commission made clear in the Extension Order that state regulators with competent authority were not precluded from reviewing the prudence of their gas utilities' decision-making.  Extension Order P 17 n.56, JA___; *see also* Certificate Order P 38 (noting the fact of a favorable North Carolina Commission review of Dominion's original precedent agreement), JA___.[9]

Appalachian suggests that it presented "compelling evidence demonstrating a lack of market demand" to the Commission.  *See* Br. 49.  But what the record in fact showed is that Dominion had

---

[9] Although the Court in *New Jersey Conservation Found. v. FERC*, 111 F.4th 42 (D.C. Cir. 2024) (Case Nos. 23-1064 *et al.*), *rehearing requested* Sept. 13, 2024, vacated the Commission certificate orders at issue there, the *New Jersey* Court did not question the Commission's finding that state regulatory authorities with competent authority could conduct later reviews of the decisions of state-jurisdictional gas utility shippers.  *Compare id.* at 61, 62 *with Transcontinental Gas Pipe Line Co. LLC*, 182 FERC ¶ 61,148, at P 28 (2023) *and* Certificate Order P 50 & n.108 (noting this point), JA___, *and* Extension Order P 17 n.56 (same), JA___.  Furthermore, unlike *New Jersey*, the petitioners here have not argued that gas utility shippers may have a shareholder-driven motive for making a financial commitment to the Southgate Project.  *See* Reh'g Request at 23-24 (basing market need argument on ostensible "decline of demand" and weight of precedent agreements), JA___-___; Br. 39-50 (same).

made a financial commitment to Project service, which Dominion
believed would facilitate gas supply diversity and reliable service to new
retail customers.  Dominion July 5, 2023 Comments at 1-2, R. 697,
JA___-___.  While the Governor of North Carolina indicated that new
emissions goals for the electric power sector in his State had been
enacted, North Carolina Governor July 24, 2023 Comments at 1-2,
R. 821, JA___-___, Duke indicated that new Project gas capacity would
be helpful in meeting Duke's electric power environmental targets and
fuel security challenges, *see* Duke July 19, 2023 Comments at 1-2,
R. 762, JA___-___.

The Commission did not opine on the wisdom of these decisions
and strategies, as such matters are entrusted to other bodies.
*See* Extension Order P 17 & nn.56-57, JA___; *see also Northern Natural*,
186 FERC ¶ 61,064 at PP 29-30 (Commission "unable to determine how
individual projects . . . comply with [the] goals or laws" of other
authorities); Certificate Order PP 39, 45 (declining to scrutinize the
decisions of individual shippers and citing, in part, *RH energytrans*, 165
FERC ¶ 61,218 at P 21), JA___, ___; *Myersville*, 783 F.3d at 1311
(noting that "it is Commission policy to not look behind precedent or

service agreements to make judgments about the needs of individual shippers" (citation omitted)).  (And as for decisions that *are* entrusted to the Commission, it made clear here that a future Project amendment proposal would be studied according to the applicable statutory standards.  Rehearing Order P 16, JA___.)

In assessing all this, the Commission concluded that Appalachian's purportedly new information or data did not undermine the Certificate Order's extensive discussion of and findings regarding market need.  *See* Extension Order P 17, JA___.  Its conclusion was reasonable and is entitled to respect.  *See Northern Access Extension*, 97 F.4th at 28 (rejecting petitioner argument where "FERC's decision not to revisit its market-need finding was reasonable and supported by the record evidence").[10]

---

[10] In addition, because this case involves an application of the Commission's "forward-looking policy" to an extension of time request, and not a full analysis of project benefits and impacts involved in granting a new certificate, the *New Jersey* Court's analysis is further distinguishable.  *Compare* Rehearing Order P 18, JA___ *with* 111 F.4th at 62-63.

### C.     The Commission Reasonably Explained Why It Declined to Revisit Its Environmental Analysis

Appalachian's final set of arguments relates to allegedly new evidence regarding the projected impacts of the Southgate project on soil and aquatic resources.  Br. 51-57.

As background, erosion and sedimentation impacts were discussed in the Project's EIS and the Certificate and Certificate Rehearing Orders.  *See, e.g.*, Certificate Order PP 141-143 (citing EIS at 2-22, 4-13, 4-14, JA___, ___-___), JA___-___; Certificate Rehearing Order PP 27-31, JA___-___, *petition for review denied by Southgate*, 38 F.4th at 232-35. The EIS studied erosion and sediment controls for the Southgate Project and concluded that the controls used for the Mainline System construction (i.e., the imposition of FERC's Erosion Plan, Mitigation Procedures, and other activities) would be sufficient for Southgate construction too, a conclusion this Court found reasonable on review. *See* Certificate Rehearing Order P 28, JA____; *Southgate*, 38 F.4th at 232-33 (citing Feb. 14, 2020 EIS at 1-12, 1-13, 2-19, 2-21, 2-22, 2-30, 4-50, 5-5, R. 566, JA___, ___, ___, ___, ___, ___, ___, ___); Extension Order P 25 (noting that assertion was rejected in *Southgate*), JA___.  As the *Southgate* Court found, the Commission's original analysis was

"fulsome in its discussion of potential mitigation measures and differences from the Mainline System," which satisfied NEPA. 38 F.4th at 233. Indeed, the EIS responded to "numerous comments" received regarding the Mainline System's erosion and sediment control activities, and it discussed the mitigation, inspection, and supplemental control measures to be imposed on the Southgate Project consistent with Commission and state guidelines. *See* EIS at ES-4 to ES-6, 1-12 to 1-13, 2-12 to 2-14, 5-5, JA___-___, ___-___, ___-___, ___; *see also* Extension Order P 26 (referencing weather monitoring and other measures imposed on Southgate construction), JA___-___.

However, Appalachian believes that further documentation of sedimentation and erosion events involving the Mainline System should have led the Commission to reopen its environmental analysis in the challenged orders. Br. 51-52. This contention fails for two reasons.

## 1. The Evidence Gathered After the Certificate Rehearing Order Did Not Indicate Significant Erosion and Sedimentation Problems for Aquatic Resources

*First*, the Commission reviewed Appalachian's evidence and was not persuaded that it was significant. Appalachian draws attention to Virginia state agency inspection reports and other documentation

56

regarding Mainline System construction activities in the years 2018 through 2021. *See* Appalachian Comments at 22-23 & nn.36-38, R. 817, JA___-___; Br. 52-53. This information had been submitted to the Commission before. *See* Wild Virginia Comments at 2-4, FERC Docket No. CP16-10-000 (filed July 7, 2022) (drawing upon data compiled by the Virginia Department of Environmental Quality).[11] And it had been contested in detail by Mountain Valley before in those proceedings. *See, e.g.*, Mountain Valley Pipeline, LLC, Response to Wild Virginia Comment Letter at 13-22, FERC Docket No. CP16-10-000 (filed Mar. 15, 2023) (Mountain Valley Mainline Answer).[12]

Using this data, commenters opposing the Southgate extension request highlighted around 100 alleged instances of erosion and sediment control issues during Mainline construction in 2020-2021 that occurred along terrain similar to that expected to be traversed by the

---

[11] FERC eLibrary Accession No. 20220707-5194, *available at* https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20220707-5194.

[12] FERC eLibrary Accession No. 20230315-5062, *available at* https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20230315-5062.

Southgate Project. *See* Appalachian Comments at 21-23, 26-27, R. 817 (referencing this data and arguing that it indicated "severe" impacts on water quality and aquatic resources), JA\_\_\_-\_\_\_, \_\_\_-\_\_\_; Extension Order P 26 & n.88 (noting that these instances represented a small portion of the cited data), JA\_\_\_-\_\_\_. Appalachian labels these instances "failures" by Mountain Valley. Br. 52-55. It faults the Commission for not concluding that these events violated state-enforced water quality standards. *See* Br. 55; Reh'g Request at 29, JA\_\_\_.

But the Virginia state regulatory agency whose filings and reports Appalachian cited denied that these instances amounted to significant water quality violations. *See* Extension Order PP 26 n.88, 27 & nn.90-92, JA\_\_\_; *see also* Mountain Valley Aug. 14 Answer at 7, R. 862 (responding to Wild Virginia's assertions), JA\_\_\_. The state agency "[did] not agree that there have been widespread impacts and destruction" or "ongoing, significant regular violations of erosion and sediment controls or water quality standards" associated with Mainline System construction. *See* Mountain Valley Mainline Answer at 19-20

(quoting Virginia Department memorandum).[13]  The state agency

reached these conclusions after an almost daily presence of inspectors

in the field.  *See id.*; Extension Order P 27, JA___.[14]

From this analysis—and the Fourth Circuit's affirmance of the

resulting Virginia water quality certification for the Mainline System—

the Commission concluded that no additional environmental study and

mitigation was necessary to simply grant an extension of time for

Southgate Project completion.  Extension Order P 27 & n.93 (citing

---

[13] The underlying memorandum indicating a lack of violations was included in the Virginia State Water Control Board's December 14, 2021 public meeting agenda, available here.  *See* https://perma.cc/LU77-WVMH (at pages 2, 293-296).  Also, Appalachian's arguments before the Commission focused on Mainline System construction activities subject to *Virginia* state authority, not activities in West Virginia.  *See* Appalachian Comments at 23, 25-27, JA____, ___-___; Extension Order PP 26-27, JA___-___; Reh'g Request at 26-30 (focusing on "the 2018 storms" and citing Wild Virginia's 2021 report), JA___-___.  Appalachian's references to West Virginia events are therefore not relevant.  *See* Br. 56 (citing *Sierra Club v. W.V. Dept. of Envt'l Protection*, 64 F.4th 487, 498, 501-04 (4th Cir. 2023)).

[14] The environmental review staff at another federal agency also reached similar conclusions about the Virginia state reports.  *See* U.S. Forest Service, *Final Supplemental Environmental Impact Statement for Mountain Valley Pipeline and Equitrans Expansion Project* at 47-49 & n.26 (filed April 17, 2023 in FERC Docket No. CP16-10-000), *available at* https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20230417-0011&optimized=false.

*Sierra Club v. State Water Control Bd.*, 64 F.4th 187, 198-99 (4th Cir. 2023) (*Virginia Board*)), JA___.  Appalachian offers no legal basis or sound reason for the Commission to second-guess a state agency's conclusions that draw upon that agency's own data.

Instead, Appalachian turns to this Court's since-vacated opinion regarding the necessity of a supplemental environmental study of the Mainline Project's erosion and sedimentation issues.  *See* Br. 53-54 (citing *Sierra Club v. FERC*, 68 F.4th 630, 650-51 (D.C. Cir. 2023) (*Mainline Extension*), *vacated by* 2023 WL 5537562 (D.C. Cir. Aug. 25, 2023)).  That *Mainline Extension* opinion did not vacate the underlying Commission orders on review there and it noted that Mountain Valley had since agreed to additional control measures for Mainline System construction.  *See* 68 F.4th at 652.

But even if that opinion remained in force, extending and applying it here would invite tension with the *Southgate* decision and especially with the Fourth Circuit's *Virginia Board* decision.  Those courts respectively found the Southgate EIS sufficient and the Virginia water quality certification for the Mainline System reasonable, despite concerns raised by the Sierra Club and others about Mainline System

60

erosion and sedimentation events.  *See Southgate*, 38 F.4th at 233;

*Virginia Board*, 64 F.4th at 198-99.  The Court should reject this

additional attempt to cover the same ground, as the Commission

reasonably interpreted the state agency's conclusions and the post-

Certificate Order evidence that commenters presented.  *See* Extension

Order PP 25-27, JA___-___; Rehearing Order PP 18-19, JA___-___.

## 2.    Nothing About the Extension Request Itself Required Further Environmental Study

*Second*, as the Commission explained, an extension of time

request is not by itself an event that triggers supplemental NEPA

review—that type of request does not mean that there are "substantial

changes to the proposed action," nor does it ask for "a new approval of

the specific project."  Rehearing Order P 19 (citation omitted), JA___.[15]

Mountain Valley had not made any substantial changes to the Project.

*Id.*, JA___-___.  And any future proposal to amend the Project would be

studied separately, including regarding its expected environmental

---

[15] Also, Appalachian's rehearing request did not make any reference to NEPA regulations and made only a passing reference to soil resources, and thus any argument about those subjects has not been preserved.  *Compare* Br. at 51, 56 *with* Reh'g Request at 24-30, JA___-___ *and* 15 U.S.C. § 717r(b).

impacts.  *Id.* P 16, JA___.  Appalachian and others will have an opportunity at that point to raise any concerns about a redesigned Project's environmental impacts.

This conclusion aligns with *Northern Access Extension* and should be similarly affirmed.  *See* 97 F.4th at 28-29 (noting that where the project sponsor had made "no changes to the proposed project," and the overall market need remained, the Commission "permissibly found that the only issue properly before it was the time needed to complete the project").

## CONCLUSION

For the foregoing reasons, the Court should deny the petitions for

review.

Respectfully submitted,

Matthew R. Christiansen
General Counsel

Robert H. Solomon
Solicitor

*/s/ Jason T. Perkins*
Jason T. Perkins
Attorney

Federal Energy Regulatory Commission
Washington, D.C.  20426
Tel.: (202) 502-6413
Fax: (202) 273-0901
Email: jason.perkins@ferc.gov

October 3, 2024

63

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Circuit Rule 32(e), I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,906 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

I further certify that this brief complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Century Schoolbook 14-point font using Microsoft Word.

*/s/ Jason T. Perkins*
Jason T. Perkins
Attorney

Federal Energy Regulatory Commission
Washington, D.C.  20426
Tel.: (202) 502-6413
Fax: (202) 273-0901
Email: jason.perkins@ferc.gov

October 3, 2024

# ADDENDUM

## STATUTES

## AND

## REGULATIONS

# TABLE OF CONTENTS

Administrative Procedure Act
    5 U.S.C. § 706(2)(A) ................................................................ A-1

Fiscal Responsibility Act of 2023
    Section 324, Pub. L. No. 118-5, 137 Stat. 47 ........................... A-2

Natural Gas Act
    Section 7, 15 U.S.C. § 717f ...................................................... A-5

    Section 16, 15 U.S.C. § 717*o* ................................................... A-7

    Section 19, 15 U.S.C. § 717r .................................................... A-8

Regulations
    18 C.F.R. § 157.14(a) ............................................................... A-10

    18 C.F.R. § 157.20(b) ............................................................... A-16

    18 C.F.R. § 385.2005(a) ............................................................ A-18

    18 C.F.R. § 385.2008(a) ............................................................ A-19

erwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

## § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

## § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### Statutory Notes and Related Subsidiaries

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

| Sec. | |
|---|---|
| 801. | Congressional review. |
| 802. | Congressional disapproval procedure. |
| 803. | Special rule on statutory, regulatory, and judicial deadlines. |
| 804. | Definitions. |
| 805. | Judicial review. |
| 806. | Applicability; severability. |
| 807. | Exemption for monetary policy. |
| 808. | Effective date of certain rules. |

## § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Rep-

137 STAT. 10          PUBLIC LAW 118–5—JUN. 3, 2023

Public Law 118–5
118th Congress

## An Act

June 3, 2023
[H.R. 3746]

To provide for a responsible increase to the debt ceiling.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Fiscal
Responsibility
Act of 2023.
2 USC 900 note.

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Fiscal Responsibility Act of 2023".

**SEC. 2. TABLE OF CONTENTS.**

The table of contents for this Act is as follows:

Sec. 1. Short title.
Sec. 2. Table of contents.
Sec. 3. References.

DIVISION A—LIMIT FEDERAL SPENDING

TITLE I—DISCRETIONARY SPENDING LIMITS FOR DISCRETIONARY CATEGORY

Sec. 101. Discretionary spending limits.
Sec. 102. Special adjustments for fiscal years 2024 and 2025.
Sec. 103. Budgetary treatment of previously enacted emergency requirements.

TITLE II—BUDGET ENFORCEMENT IN THE HOUSE OF REPRESENTATIVES

Sec. 111. Authority for Fiscal Year 2024 Budget Resolution in the House of Representatives.
Sec. 112. Limitation on Advance Appropriations in the House of Representatives.
Sec. 113. Exercise of rulemaking powers.

TITLE III—BUDGET ENFORCEMENT IN THE SENATE

Sec. 121. Authority for fiscal year 2024 budget resolution in the Senate.
Sec. 122. Authority for fiscal year 2025 budget resolution in the Senate.
Sec. 123. Limitation on advance appropriations in the Senate.
Sec. 124. Exercise of rulemaking powers.

DIVISION B—SAVE TAXPAYER DOLLARS

TITLE I—RESCISSION OF UNOBLIGATED FUNDS

Sec. 1. Rescission of unobligated funds.
Sec. 2. Rescission of unobligated funds.
Sec. 3. Rescission of unobligated funds.
Sec. 4. Rescission of unobligated funds.
Sec. 5. Rescission of unobligated funds.
Sec. 6. Rescission of unobligated funds.
Sec. 7. Rescission of unobligated funds.
Sec. 8. Rescission of unobligated funds.
Sec. 9. Rescission of unobligated funds.
Sec. 10. Rescission of unobligated funds.
Sec. 11. Rescission of unobligated funds.
Sec. 12. Rescission of unobligated funds.
Sec. 13. Rescission of unobligated funds.
Sec. 14. Rescission of unobligated funds.
Sec. 15. Rescission of unobligated funds.

PUBLIC LAW 118–5—JUN. 3, 2023          137 STAT. 47

**SEC. 324. EXPEDITING COMPLETION OF THE MOUNTAIN VALLEY PIPE- LINE.**

(a) DEFINITION OF MOUNTAIN VALLEY PIPELINE.—In this sec- tion, the term "Mountain Valley Pipeline" means the Mountain Valley Pipeline project, as generally described and approved in Federal Energy Regulatory Commission Docket Nos. CP16–10, CP19–477, and CP21–57.

(b) CONGRESSIONAL FINDINGS AND DECLARATION.—The Con- gress hereby finds and declares that the timely completion of construction and operation of the Mountain Valley Pipeline is required in the national interest. The Mountain Valley Pipeline will serve demonstrated natural gas demand in the Northeast, Mid-Atlantic, and Southeast regions, will increase the reliability of natural gas supplies and the availability of natural gas at reason- able prices, will allow natural gas producers to access additional markets for their product, and will reduce carbon emissions and facilitate the energy transition.

(c) APPROVAL AND RATIFICATION AND MAINTENANCE OF EXISTING AUTHORIZATIONS.—Notwithstanding any other provision of law—

(1) Congress hereby ratifies and approves all authoriza- tions, permits, verifications, extensions, biological opinions, inci- dental take statements, and any other approvals or orders issued pursuant to Federal law necessary for the construction and initial operation at full capacity of the Mountain Valley Pipeline; and

(2) Congress hereby directs the Secretary of the Army, the Federal Energy Regulatory Commission, the Secretary of Agriculture, and the Secretary of the Interior, and other agen- cies as applicable, as the case may be, to continue to maintain such authorizations, permits, verifications, extensions, biological opinions, incidental take statements, and any other approvals or orders issued pursuant to Federal law necessary for the construction and initial operation at full capacity of the Mountain Valley Pipeline.

(d) EXPEDITED APPROVAL.—Notwithstanding any other provi- sion of law, not later than 21 days after the date of enactment of this Act and for the purpose of facilitating the completion of the Mountain Valley Pipeline, the Secretary of the Army shall issue all permits or verifications necessary—

Deadline.

(1) to complete the construction of the Mountain Valley Pipeline across the waters of the United States; and

(2) to allow for the operation and maintenance of the Moun- tain Valley Pipeline.

(e) JUDICIAL REVIEW.—

(1) Notwithstanding any other provision of law, no court shall have jurisdiction to review any action taken by the Sec- retary of the Army, the Federal Energy Regulatory Commission, the Secretary of Agriculture, the Secretary of the Interior, or a State administrative agency acting pursuant to Federal law that grants an authorization, permit, verification, biological opinion, incidental take statement, or any other approval nec- essary for the construction and initial operation at full capacity of the Mountain Valley Pipeline, including the issuance of any authorization, permit, extension, verification, biological opinion, incidental take statement, or other approval described in sub- section (c) or (d) of this section for the Mountain Valley Pipeline,

PUBLIC LAW 118–5—JUN. 3, 2023

whether issued prior to, on, or subsequent to the date of enactment of this section, and including any lawsuit pending in a court as of the date of enactment of this section.

(2) The United States Court of Appeals for the District of Columbia Circuit shall have original and exclusive jurisdiction over any claim alleging the invalidity of this section or that an action is beyond the scope of authority conferred by this section.

(f) EFFECT.—This section supersedes any other provision of law (including any other section of this Act or other statute, any regulation, any judicial decision, or any agency guidance) that is inconsistent with the issuance of any authorization, permit, verification, biological opinion, incidental take statement, or other approval for the Mountain Valley Pipeline.

# DIVISION D—INCREASE IN DEBT LIMIT

31 USC 3101 note.
Time period.

**SEC. 401. TEMPORARY EXTENSION OF PUBLIC DEBT LIMIT.**

(a) IN GENERAL.—Section 3101(b) of title 31, United States Code, shall not apply for the period beginning on the date of the enactment of this Act and ending on January 1, 2025.

Effective date.

(b) SPECIAL RULE RELATING TO OBLIGATIONS ISSUED DURING EXTENSION PERIOD.—Effective on January 2, 2025, the limitation in effect under section 3101(b) of title 31, United States Code, shall be increased to the extent that—

(1) the face amount of obligations issued under chapter 31 of such title and the face amount of obligations whose principal and interest are guaranteed by the United States Government (except guaranteed obligations held by the Secretary of the Treasury) outstanding on January 2, 2025, exceeds

(2) the face amount of such obligations outstanding on the date of the enactment of this Act.

(c) RESTORING CONGRESSIONAL AUTHORITY OVER THE NATIONAL DEBT.—

Deadline.

(1) EXTENSION LIMITED TO NECESSARY OBLIGATIONS.—An obligation shall not be taken into account under subsection (b)(1) unless the issuance of such obligation was necessary to fund a commitment incurred pursuant to law by the Federal Government that required payment before January 2, 2025.

(2) PROHIBITION ON CREATION OF CASH RESERVE DURING EXTENSION PERIOD.—The Secretary of the Treasury shall not issue obligations during the period specified in subsection (a) for the purpose of increasing the cash balance above normal

## § 717f. Construction, extension, or abandonment of facilities

### (a) Extension or improvement of facilities on order of court; notice and hearing

Whenever the Commission, after notice and opportunity for hearing, finds such action necessary or desirable in the public interest, it may by order direct a natural-gas company to extend or improve its transportation facilities, to establish physical connection of its transportation facilities with the facilities of, and sell natural gas to, any person or municipality engaged or legally authorized to engage in the local distribution of natural or artificial gas to the public, and for such purpose to extend its transportation facilities to communities immediately adjacent to such facilities or to territory served by such natural-gas company, if the Commission finds that no undue burden will be placed upon such natural-gas company thereby: *Provided*, That the Commission shall have no authority to compel the enlargement of transportation facilities for such purposes, or to compel such natural-gas company to establish physical connection or sell natural gas when to do so would impair its ability to render adequate service to its customers.

### (b) Abandonment of facilities or services; approval of Commission

No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment.

### (c) Certificate of public convenience and necessity

(1)(A) No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations: *Provided, however*, That if any such natural-gas company or predecessor in interest was bona fide engaged in transportation or sale of natural gas, subject to the jurisdiction of the Commission, on February 7, 1942, over the route or routes or within the area for which application is made and has so operated since that time, the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate is made to the Commission within ninety days after February 7, 1942. Pending the determination of any such application, the continuance of such operation shall be lawful.

(B) In all other cases the Commission shall set the matter for hearing and shall give such reasonable notice of the hearing thereon to all interested persons as in its judgment may be necessary under rules and regulations to be prescribed by the Commission; and the application shall be decided in accordance with the procedure provided in subsection (e) of this section and such certificate shall be issued or denied accordingly: *Provided, however*, That the Commission may issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate, and may by regulation exempt from the requirements of this section temporary acts or operations for which the issuance of a certificate will not be required in the public interest.

(2) The Commission may issue a certificate of public convenience and necessity to a natural-gas company for the transportation in interstate commerce of natural gas used by any person for one or more high-priority uses, as defined, by rule, by the Commission, in the case of—

(A) natural gas sold by the producer to such person; and

(B) natural gas produced by such person.

### (d) Application for certificate of public convenience and necessity

Application for certificates shall be made in writing to the Commission, be verified under oath, and shall be in such form, contain such information, and notice thereof shall be served upon such interested parties and in such manner as the Commission shall, by regulation, require.

### (e) Granting of certificate of public convenience and necessity

Except in the cases governed by the provisos contained in subsection (c)(1) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require.

### (f) Determination of service area; jurisdiction of transportation to ultimate consumers

(1) The Commission, after a hearing had upon its own motion or upon application, may determine the service area to which each authorization under this section is to be limited. Within such service area as determined by the Commission a natural-gas company may enlarge or extend its facilities for the purpose of supplying

increased market demands in such service area without further authorization; and

(2) If the Commission has determined a service area pursuant to this subsection, transportation to ultimate consumers in such service area by the holder of such service area determination, even if across State lines, shall be subject to the exclusive jurisdiction of the State commission in the State in which the gas is consumed. This section shall not apply to the transportation of natural gas to another natural gas company.

**(g) Certificate of public convenience and necessity for service of area already being served**

Nothing contained in this section shall be construed as a limitation upon the power of the Commission to grant certificates of public convenience and necessity for service of an area already being served by another natural-gas company.

**(h) Right of eminent domain for construction of pipelines, etc.**

When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: *Provided,* That the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

(June 21, 1938, ch. 556, §7, 52 Stat. 824; Feb. 7, 1942, ch. 49, 56 Stat. 83; July 25, 1947, ch. 333, 61 Stat. 459; Pub. L. 95–617, title VI, §608, Nov. 9, 1978, 92 Stat. 3173; Pub. L. 100–474, §2, Oct. 6, 1988, 102 Stat. 2302.)

### Editorial Notes

#### AMENDMENTS

1988—Subsec. (f). Pub. L. 100–474 designated existing provisions as par. (1) and added par. (2).

1978—Subsec. (c). Pub. L. 95–617, §608(a), (b)(1), designated existing first paragraph as par. (1)(A) and existing second paragraph as par. (1)(B) and added par. (2).

Subsec. (e). Pub. L. 95–617, §608(b)(2), substituted "subsection (c)(1)" for "subsection (c)".

1947—Subsec. (h). Act July 25, 1947, added subsec. (h).

1942—Subsecs. (c) to (g). Act Feb. 7, 1942, struck out subsec. (c), and added new subsecs. (c) to (g).

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–474, §3, Oct. 6, 1988, 102 Stat. 2302, provided that: "The provisions of this Act [amending this sec-

tion and enacting provisions set out as a note under section 717w of this title] shall become effective one hundred and twenty days after the date of enactment [Oct. 6, 1988]."

### Executive Documents

#### TRANSFER OF FUNCTIONS

Enforcement functions of Secretary or other official in Department of Energy and Commission, Commissioners, or other official in Federal Energy Regulatory Commission related to compliance with certificates of public convenience and necessity issued under this section with respect to pre-construction, construction, and initial operation of transportation system for Canadian and Alaskan natural gas transferred to Federal Inspector, Office of Federal Inspector for Alaska Natural Gas Transportation System, until first anniversary of date of initial operation of Alaska Natural Gas Transportation System, see Reorg. Plan No. 1 of 1979, §§102(d), 203(a), 44 F.R. 33663, 33666, 93 Stat. 1373, 1376, effective July 1, 1979, set out under section 719e of this title. Office of Federal Inspector for the Alaska Natural Gas Transportation System abolished and functions and authority vested in Inspector transferred to Secretary of Energy by section 3012(b) of Pub. L. 102–486, set out as an Abolition of Office of Federal Inspector note under section 719e of this title. Functions and authority vested in Secretary of Energy subsequently transferred to Federal Coordinator for Alaska Natural Gas Transportation Projects by section 720d(f) of this title.

### § 717g. Accounts; records; memoranda

**(a) Rules and regulations for keeping and preserving accounts, records, etc.**

Every natural-gas company shall make, keep, and preserve for such periods, such accounts, records of cost-accounting procedures, correspondence, memoranda, papers, books, and other records as the Commission may by rules and regulations prescribe as necessary or appropriate for purposes of the administration of this chapter: *Provided, however,* That nothing in this chapter shall relieve any such natural-gas company from keeping any accounts, memoranda, or records which such natural-gas company may be required to keep by or under authority of the laws of any State. The Commission may prescribe a system of accounts to be kept by such natural-gas companies, and may classify such natural-gas companies and prescribe a system of accounts for each class. The Commission, after notice and opportunity for hearing, may determine by order the accounts in which particular outlays or receipts shall be entered, charged, or credited. The burden of proof to justify every accounting entry questioned by the Commission shall be on the person making, authorizing, or requiring such entry, and the Commission may suspend a charge or credit pending submission of satisfactory proof in support thereof.

**(b) Access to and inspection of accounts and records**

The Commission shall at all times have access to and the right to inspect and examine all accounts, records, and memoranda of natural-gas companies; and it shall be the duty of such natural-gas companies to furnish to the Commission, within such reasonable time as the Commission may order, any information with respect thereto which the Commission may by order require, including copies of maps, con-

ices, records, and facilities as may be afforded by any State commission.

## (c) Information and reports available to State commissions

The Commission shall make available to the several State commissions such information and reports as may be of assistance in State regulation of natural-gas companies. Whenever the Commission can do so without prejudice to the efficient and proper conduct of its affairs, it may, upon request from a State commission, make available to such State commission as witnesses any of its trained rate, valuation, or other experts, subject to reimbursement of the compensation and traveling expenses of such witnesses. All sums collected hereunder shall be credited to the appropriation from which the amounts were expended in carrying out the provisions of this subsection.

(June 21, 1938, ch. 556, § 17, 52 Stat. 830.)

## § 717q. Appointment of officers and employees

The Commission is authorized to appoint and fix the compensation of such officers, attorneys, examiners, and experts as may be necessary for carrying out its functions under this chapter; and the Commission may, subject to civil-service laws, appoint such other officers and employees as are necessary for carrying out such functions and fix their salaries in accordance with chapter 51 and subchapter III of chapter 53 of title 5.

(June 21, 1938, ch. 556, § 18, 52 Stat. 831; Oct. 28, 1949, ch. 782, title XI, § 1106(a), 63 Stat. 972.)

### Editorial Notes

#### Codification

Provisions that authorized the Commission to appoint and fix the compensation of such officers, attorneys, examiners, and experts as may be necessary for carrying out its functions under this chapter "without regard to the provisions of other laws applicable to the employment and compensation of officers and employees of the United States" are omitted as obsolete and superseded.

As to the compensation of such personnel, sections 1202 and 1204 of the Classification Act of 1949, 63 Stat. 972, 973, repealed the Classification Act of 1923 and all other laws or parts of laws inconsistent with the 1949 Act. The Classification Act of 1949 was repealed by Pub. L. 89–554, Sept. 6, 1966, §8(a), 80 Stat. 632, and reenacted as chapter 51 and subchapter III of chapter 53 of Title 5, Government Organization and Employees. Section 5102 of Title 5 contains the applicability provisions of the 1949 Act, and section 5103 of Title 5 authorizes the Office of Personnel Management to determine the applicability to specific positions and employees.

Such appointments are now subject to the civil service laws unless specifically excepted by those laws or by laws enacted subsequent to Executive Order 8743, Apr. 23, 1941, issued by the President pursuant to the Act of Nov. 26, 1940, ch. 919, title I, § 1, 54 Stat. 1211, which covered most excepted positions into the classified (competitive) civil service. The Order is set out as a note under section 3301 of Title 5.

"Chapter 51 and subchapter III of chapter 53 of title 5" substituted in text for "the Classification Act of 1949, as amended" on authority of Pub. L. 89–554, § 7(b), Sept. 6, 1966, 80 Stat. 631, the first section of which enacted Title 5.

#### Amendments

1949—Act Oct. 28, 1949, substituted "Classification Act of 1949" for "Classification Act of 1923".

#### Statutory Notes and Related Subsidiaries

##### Repeals

Act Oct. 28, 1949, cited as a credit to this section, was repealed (subject to a savings clause) by Pub. L. 89–554, Sept. 6, 1966, §8, 80 Stat. 632, 655.

## § 717r. Rehearing and review

### (a) Application for rehearing; time

Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

### (b) Review of Commission order

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were

reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which is supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

**(c) Stay of Commission order**

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

**(d) Judicial review**

**(1) In general**

The United States Court of Appeals for the circuit in which a facility subject to section 717b of this title or section 717f of this title is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval (hereinafter collectively referred to as "permit") required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.).

**(2) Agency delay**

The United States Court of Appeals for the District of Columbia shall have original and exclusive jurisdiction over any civil action for the review of an alleged failure to act by a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.), for a facility subject to section 717b of this title or section 717f of this title. The failure of an agency to take action on a permit required under Federal law, other than the Coastal Zone Management Act of 1972, in accordance with the Commission schedule established pursuant to section 717n(c) of this title shall be considered inconsistent with Federal law for the purposes of paragraph (3).

**(3) Court action**

If the Court finds that such order or action is inconsistent with the Federal law governing such permit and would prevent the construc-

tion, expansion, or operation of the facility subject to section 717b of this title or section 717f of this title, the Court shall remand the proceeding to the agency to take appropriate action consistent with the order of the Court. If the Court remands the order or action to the Federal or State agency, the Court shall set a reasonable schedule and deadline for the agency to act on remand.

**(4) Commission action**

For any action described in this subsection, the Commission shall file with the Court the consolidated record of such order or action to which the appeal hereunder relates.

**(5) Expedited review**

The Court shall set any action brought under this subsection for expedited consideration.

(June 21, 1938, ch. 556, § 19, 52 Stat. 831; June 25, 1948, ch. 646, § 32(a), 62 Stat. 991; May 24, 1949, ch. 139, § 127, 63 Stat. 107; Pub. L. 85–791, § 19, Aug. 28, 1958, 72 Stat. 947; Pub. L. 109–58, title III, § 313(b), Aug. 8, 2005, 119 Stat. 689.)

**Editorial Notes**

REFERENCES IN TEXT

The Coastal Zone Management Act of 1972, referred to in subsec. (d)(1), (2), is title III of Pub. L. 89–454, as added by Pub. L. 92–583, Oct. 27, 1972, 86 Stat. 1280, which is classified generally to chapter 33 (§ 1451 et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 1451 of Title 16 and Tables.

CODIFICATION

In subsec. (b), "section 1254 of title 28" substituted for "sections 239 and 240 of the Judicial Code, as amended [28 U.S.C. 346, 347]" on authority of act June 25, 1948, ch. 646, 62 Stat. 869, the first section of which enacted Title 28, Judiciary and Judicial Procedure.

AMENDMENTS

2005—Subsec. (d). Pub. L. 109–58 added subsec. (d).
1958—Subsec. (a). Pub. L. 85–791, § 19(a), inserted sentence providing that until record in a proceeding has been filed in a court of appeals, Commission may modify or set aside any finding or order issued by it.
Subsec. (b). Pub. L. 85–791, § 19(b), in second sentence, substituted "transmitted by the clerk of the court to" for "served upon", substituted "file with the court" for "certify and file with the court a transcript of", and inserted "as provided in section 2112 of title 28", and, in third sentence, substituted "petition" for "transcript", and "jurisdiction, which upon the filing of the record with it shall be exclusive" for "exclusive jurisdiction".

**Statutory Notes and Related Subsidiaries**

CHANGE OF NAME

Act June 25, 1948, eff. Sept. 1, 1948, as amended by act May 24, 1949, substituted "court of appeals" for "circuit court of appeals" wherever appearing.

**§ 717s. Enforcement of chapter**

**(a) Action in district court for injunction**

Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, it may in its discretion bring an ac-

chapter and contain a title page showing applicant's name, docket number (to be left blank), title of the exhibit, the proper letter designation of the exhibit, and, if of 10 or more pages, a table of contents, citing by page, section number or subdivision, the component elements or matters therein contained.

(b) *Reference to annual reports and previous applications.* An application may refer to annual reports and previous applications filed with the Commission and shall specify the exact pages or exhibit numbers of the filing to which reference is made, including the page numbers in any exhibit to which reference is made. When reference is made to a previous application the docket number shall be stated. No part of a rejected application may be incorporated by reference.

(c) *Interdependent applications.* When an application considered alone is incomplete and depends vitally upon information in another application, it will not be accepted for filing until the supporting application has been filed. When applications are interdependent, they shall be filed concurrently.

(d) *Measurement base.* All gas volumes, including gas purchased from producers, shall be stated upon a uniform basis of measurement, and, in addition, if the uniform basis of measurement used in any application is other than 14.73 p.s.i.a., then any volume or volumes delivered to or received from any interstate natural-gas pipeline company shall also be stated upon a basis of 14.73 p.s.i.a.; similarly, total volumes on all summary sheets, as well as grand totals of volumes in any exhibit, shall also be stated upon a basis of 14.73 p.s.i.a. if the uniform basis of measurement used is other than 14.73 p.s.i.a.

[17 FR 7387, Aug. 14, 1952, as amended by Order 185, 21 FR 1486, Mar. 8, 1956; Order 280, 29 FR 4877, Apr. 7, 1964; Order 493, 53 FR 15029, Apr. 27, 1988]

## § 157.14 Exhibits.

(a) *To be attached to each application.* All exhibits specified must accompany each application when tendered for filing. Together with each exhibit applicant must provide a full and complete explanation of the data submitted, the manner in which it was obtained, and the reasons for the conclusions derived from the exhibits. If the Commission determines that a formal hearing upon the application is required or that testimony and hearing exhibits should be filed, the Secretary will promptly notify the applicant that submittal of all exhibits and testimony of all witnesses to be sponsored by the applicant in support of his case-in-chief is required. Submittal of these exhibits and testimony must be within 20 days from the date of the Secretary's notice, or any other time as the Secretary will specify. Exhibits, except exhibits F, F–1, G, G–I, and G–II, must be submitted to the Commission on electronic media as prescribed in § 385.2011 of this chapter. Receipt and delivery point information required in various exhibits must be labeled with a location point name and code in conformity with the location name and code the pipeline has adopted in conformance with § 284.13(f) of this chapter. Intervenors and persons becoming intervenors after the date of the Secretary's notice must be advised by the applicant of the afore-specified exhibits and testimony, and must be furnished with copies upon request. If this section requires an applicant to reveal Critical Energy Infrastructure Information (CEII), as defined by § 388.113(c) of this chapter, to any person, the applicant shall follow the procedures set out in § 157.10(d).

(1) *Exhibit A—Articles of incorporation and bylaws.* If applicant is not an individual, a conformed copy of its articles of incorporation and bylaws, or other similar documents.

(2) *Exhibit B—State authorization.* For each State where applicant is authorized to do business, a statement showing the date of authorization, the scope of the business applicant is authorized to carry on and all limitations, if any, including expiration dates and renewal obligations. A conformed copy of applicant's authorization to do business in each State affected shall be supplied upon request.

(3) *Exhibit C—Company officials.* A list of the names and business addresses of applicant's officers and directors, or similar officials if applicant is not a corporation.

**Federal Energy Regulatory Commission**                          **§ 157.14**

(4) *Exhibit D—Subsidiaries and affiliation.* If applicant or any of its officers or directors, directly or indirectly, owns, controls, or holds with power to vote, 10 percent or more of the outstanding voting securities of any other person or organized group of persons engaged in production, transportation, distribution, or sale of natural gas, or of any person or organized group of persons engaged in the construction or financing of such enterprises or operations, a detailed explanation of each such relationship, including the percentage of voting strength represented by such ownership of securities. If any person or organized group of persons, directly or indirectly, owns, controls, or holds with power to vote, 10 percent or more of the outstanding voting securities of applicant—a detailed explanation of each such relationship.

(5) *Exhibit E—Other pending applications and filings.* A list of other applications and filings under sections 1, 3, 4 and 7 of the Natural Gas Act filed by the applicant which are pending before the Commission at the time of the filing of an application and which directly and significantly affect the application filed, including an explanation of any material effect the grant or denial of those other applications and filings will have on the application and of any material effect the grant or denial of the application will have on those other applications and filings.

(6) *Exhibit F—Location of facilities.* Unless shown on Exhibit G or elsewhere, a geographical map of suitable scale and detail showing, and appropriately differentiating between all of the facilities proposed to be constructed, acquired or abandoned and existing facilities of applicant, the operation or capacity of which will be directly affected by the proposed facilities or the facilities proposed to be abandoned. This map, or an additional map, shall clearly show the relationship of the new facilities to the applicant's overall system and shall include:

(i) Location, length, and size of pipelines.

(ii) Location and size (rated horsepower) of compressor stations.

(iii) Location and designation of each point of connection of existing and proposed facilities with:

(A) Main-line industrial customers, gas pipeline or distribution systems, showing towns and communities served and to be served at wholesale and retail, and

(B) Gas-producing and storage fields, or other sources of gas supply.

(7) *Exhibit F–I—Environmental report.* An environmental report as specified in §§380.3 and 380.12 of this chapter. Applicant must submit all appropriate revisions to Exhibit F–I whenever route or site changes are filed. These revisions should identify the locations by mile post and describe all other specific differences resulting from the route or site changes, and should not simply provide revised totals for the resources affected.

(8) *Exhibit G—Flow diagrams showing daily design capacity and reflecting operation with and without proposed facilities added.* A flow diagram showing daily design capacity and reflecting operating conditions with only existing facilities in operation. A second flow diagram showing daily design capacity and reflecting operating conditions with both proposed and existing facilities in operation. Both flow diagrams shall include the following for the portion of the system affected:

(i) Diameter, wall thickness, and length of pipe installed and proposed to be installed and the diameter and wall thickness of the installed pipe to which connection is proposed.

(ii) For each proposed new compressor station and existing station, the size, type and number of compressor units, horsepower required, horsepower installed and proposed to be installed, volume of gas to be used as fuel, suction and discharge pressures, and compression ratio.

(iii) Pressures and volumes of gas at the main line inlet and outlet connections at each compressor station.

(iv) Pressures and volumes of gas at each intake and take-off point and at the beginning and terminus of the existing and proposed facilities and at the intake or take-off point of the existing facilities to which the proposed facilities are to be connected.

(9) *Exhibit G–I—Flow diagrams reflecting maximum capabilities.* If Exhibit G does not reflect the maximum deliveries which applicant's existing and

613

proposed facilities would be capable of achieving under most favorable operating conditions with utilization of all facilities, include an additional diagram or diagrams to depict such maximum capabilities. If the horsepower, pipelines, or other facilities on the segment of applicant's system under consideration are not being fully utilized due, *e.g.,* to capacity limitation of connecting facilities or because of the need for standby or spare equipment, the reason for such nonutilization shall be stated.

(10) *Exhibit G–II—Flow diagram data.* Exhibits G and G–I shall be accompanied by a statement of engineering design data in explanation and support of the diagrams and the proposed project, setting forth:

(i) Assumptions, bases, formulae, and methods used in the development and preparation of such diagrams and accompanying data.

(ii) A description of the pipe and fittings to be installed, specifying the diameter, wall thickness, yield point, ultimate tensile strength, method of fabrication, and methods of testing proposed.

(iii) When lines are looped, the length and size of the pipe in each loop.

(iv) Type, capacity, and location of each natural gas storage field or facility, and of each dehydration, desulphurization, natural gas liquefaction, hydrocarbon extraction, or other similar plant or facility directly attached to the applicant's system, indicating which of such plants are owned or operated by applicant, and which by others, giving their names and addresses.

(v) If the daily design capacity shown in *Exhibit G* is predicated upon an ability to meet each customer's maximum contract quantity on the same day, explain the reason for such coincidental peak-day design. If the design day capacity shown in Exhibit G is predicated upon an assumed diversity factor, state that factor and explain its derivation.

(vi) The maximum allowable operating pressure of each proposed facility for which a certificate is requested, as permitted by the Department of Transportation's safety standards. The applicant shall certify that it will design, install, inspect, test, construct, operate, replace, and maintain the facilities for which a certificate is requested in accordance with Federal safety standards and plans for maintenance and inspection or shall certify that it has been granted a waiver of the requirements of the safety standards by the Department of Transportation in accordance with the provisions of section 3(e) of the Natural Gas Pipeline Safety Act of 1968. Pertinent details concerning the waiver shall be set forth.

(11) *Exhibit H—Total gas supply data.* A statement by applicant describing:

(i) Those production areas accessible to the proposed construction that contain sufficient existing or potential gas supplies for the proposed project; and

(ii) How those production areas are connected to the proposed construction.

(12) *Exhibit I—Market data.* A system-wide estimate of the volumes of gas to be delivered during each of the first 3 full years of operation of the proposed service, sale, or facilities and during the years when the proposed facilities are under construction, and actual data of like import for each of the 3 years next preceding the filing of the application, together with:

(i) Names and locations of customer companies and municipalities, showing the number of residential, commercial, firm industrial, interruptible industrial, residential space-heating, commercial space-heating, and other types of customers for each distribution system to be served at retail or wholesale; and the names and locations of each firm and interruptible direct industrial customer whose estimated consumption totals 10,000 Mcf or more in any calendar month or 100,000 Mcf or more per year together with an explanation of the end use to which each of these industrial customers will put the gas.

(ii) Applicant's total annual and peak day gas requirements by classification of service in paragraph (a)(11)(i) of this section, divided as follows: Gas requirements for each distribution area where gas is sold by applicant at retail; for each wholesale customer; for all main line direct industrial customers; and company use and unaccounted-for gas, for both the applicant and each wholesale customer.

**Federal Energy Regulatory Commission**                    **§ 157.14**

(iii) Total past and expected curtailments of service by the applicant and each wholesale customer proposing to receive new or additional supplies of gas from the project, all to be listed by the classifications of service in paragraph (a)(12)(i) of this section.

(iv) Explanation and derivation of basic factors used in estimating future requirements, including, for example: Peak-day and annual degree-day deficiencies, annual load factors of applicant's system and of its deliveries to its proposed customers; individual consumer peak-day and annual consumption factors for each class of consumers, with supporting historical data; forecasted saturation of space-heating as related to past experience; and full detail as to all other sources of gas supply available to applicant and to each of its customers, including manufacturing facilities and liquid petroleum gas.

(v) Conformed copy of each contract, letter of intent or other agreement for sale or transportation of natural gas proposed by the application. Indicate the rate to be charged. If no agreements have been made, indicate the basis for assuming that contracts will be consummated and that service will be rendered under the terms contemplated in the application.

(vi) A full description of all facilities, other than those covered by the application, necessary to provide service in the communities to be served, the estimated cost of such facilities, by whom they are to be constructed, and evidence of economic feasibility.

(vii) A copy of each market survey made within the past three years for such markets as are to receive new or increased service from the project applied for.

(viii) A statement showing the franchise rights of applicant or other person to distribute gas in each community in which service is proposed.

(ix) When an application requires a statement of total peak-day or annual market requirements of affiliates, whose operations are integrated with those of applicant, to demonstrate applicant's ability to provide the service proposed or to establish a gas supply, estimates and data required by this paragraph (a)(12)(ix) shall also be stated in like detail for such affiliates.

(x) When the proposed project is for service which would not decrease the life index of the total system gas supply by more than one year, the data required in paragraphs (a)(12)(i) to (ix), inclusive, of this section need be submitted only as to the particular market to receive new or additional service.

(13) *Exhibit J—Federal authorizations.* A statement identifying each Federal authorization that the proposal will require; the Federal agency or officer, or State agency or officer acting pursuant to delegated Federal authority, that will issue each required authorization; the date each request for authorization was submitted; why any request was not submitted and the date submission is expected; and the date by which final action on each Federal authorization has been requested or is expected.

(14) *Exhibit K—Cost of facilities.* A detailed estimate of total capital cost of the proposed facilities for which application is made, showing cost of construction by operating units such as compressor stations, main pipelines, laterals, measuring and regulating stations, and separately stating the cost of right-of-way, damages, surveys, materials, labor, engineering and inspection, administrative overhead, fees for legal and other services, allowance for funds used during construction, and contingencies. Include a brief statement indicating the source of information used as the basis for the above estimate. If not otherwise set forth, submit data on preliminary bids, if any, for the proposed facilities and recent experienced cost data for facilities of similar character.

(15) *Exhibit L—Financing.* Plans for financing the proposed facilities for which the application is filed, together with:

(i) A description of the class (*e.g.,* commercial paper, long-term debt, preferred stock) and cost rates for securities expected to be issued with construction period and post- operational sources of financing separately identified.

(ii) Statement of anticipated cash flow, including provision during the period of construction and the first 3 full

615

years of operation of proposed facilities for interest requirements, dividends, and capital requirements.

(iii) A balance sheet and income statement (12 months) of most recent data available.

(iv) Comparative pro forma balance sheets and income statements for the period of construction and each of the first 3 full years of operation, giving effect to the proposed construction and proposed financing of the project.

(v) Any additional data and information upon which applicant proposes to rely in showing the adequacy and availability of resources for financing its proposed project.

(vi) In instances for which principal operations of the company have not commenced or where proposed rates for services are developed on an incremental basis, a brief statement explaining how the applicant will determine the actual allowance for funds used during construction (AFUDC) rate, or if a rate is not to be used, how the applicant will determine the actual amount of AFUDC to be capitalized as a component of construction cost, and why the method is appropriate under the circumstances.

(16) *Exhibit M—Construction, operation, and management.* A concise statement setting forth arrangements for supervision, management, engineering, accounting, legal, or other similar service to be rendered in connection with the construction or operation of the project, if not to be performed by employees of applicant, including reference to any existing or contemplated agreements therefor, together with:

(i) A statement showing affiliation between applicant and any parties to such agreements or arrangements. See Exhibit D, paragraph (a)(4) of this section.

(ii) Conformed copies of all construction, engineering, management, and other similar service agreements or contracts in any way operative with respect to construction, operation, or financing of facilities which are the subject of the application or will be applicable under system operations.

(17) *Exhibit N—Revenues—Expenses—Income.* When the estimated revenues and expenses related to a proposed facility will significantly affect the oper-

ating revenues or operating expenses of an applicant, there shall be submitted a system-wide statement for the last year preceding the proposed construction or service and pro forma system-wide and incremental statements for each of the first three full years of operation of the proposed facilities, showing:

(i) Gas system annual revenues and volumes of natural gas related thereto, subdivided by classes of service, and further subdivided by sales to direct industrial customers, sales to other gas utilities, and other sales, indicating billing quantities used for computing charges, *e.g.,* actual demands, billing demands, volumes, heat-content adjustment or other determinants. In addition, if enlargement or extension of facilities is involved, the revenues attributable solely to the proposed facilities shall be stated separately, and the basis and data used in such computation shall be clearly shown.

(ii) Gas system annual operating expenses classified in accordance with the Commission's Uniform System of Accounts for Natural Gas Companies; the annual depreciation, depletion, taxes, utility income, and resulting rate of return on net investment in gas plant including working capital. In addition if enlargement or extension of facilities is involved, the cost of service attributable solely to the proposed facilities shall be stated separately with supporting data.

(iii) When the data required in paragraphs (a)(17)(i) and (ii) of this section is not submitted, applicant shall provide in lieu thereof a statement in sufficient detail to show clearly the effect on the operating revenues and operating expenses of the estimated revenues and expenses related to the proposed facility.

(18) *Exhibit O—Depreciation and depletion.* Depreciation and depletion rates to be established, the method of determination and the justification therefor.

(19) *Exhibit P—Tariff.* (i) A statement of the rates to be charged for the proposed sales or service, including:

(A) Identification of the applicable presently effective rate schedules, when no additional tariff filings will be required, or

**Federal Energy Regulatory Commission**                                  **§ 157.15**

(B) When changes are required in applicant's presently effective tariff, or if applicant has no tariff, pro forma copies of appropriate changes in or additions to the effective tariff or a pro forma copy of the new gas tariff proposed, or

(C) When a new rate is proposed, a statement explaining the basis used in arriving at the proposed rate. Such statement shall clearly show whether such rate results from negotiation, cost-of-service determination, competitive factors or others, and shall give the nature of any studies which have been made in connection therewith.

(ii) When new rates or changes in present rates are proposed or when the proposed facilities will result in a material change in applicant's average cost of service, such statement shall be accompanied by supporting data showing:

(A) System cost of service for the first calendar year of operation after the proposed facilities are placed in service.

(B) An allocation of such costs to each particular service classification, with the basis for each allocation clearly stated.

(C) The proposed rate base and rate of return.

(D) Gas operating expenses, segregated functionally by accounts.

(E) Depletion and depreciation.

(F) Taxes with the basis upon which computed.

(b) *Additional exhibits.* Applicant shall submit additional exhibits necessary to support or clarify its application. Such exhibits shall be identified and designated as provided by § 157.6(b)(6).

(c) *Additional information.* Upon request by the Secretary, prior to or during hearing upon the application, applicant shall submit such additional data, information, exhibits, or other detail as may be specified. An original and 7 conformed copies of such additional information shall be furnished to the Commission. The Commission reserves the right to request additional copies.

(d) *Availability of Commission staff for advice prior to formal filing.* Prior to filing an application, any person may informally confer with the staff of the Commission to obtain advice on any problem of statement or presentation of an application or any part thereof.

(Secs. 3(e), 7, 8, 82 Stat. 721, 725 (49 U.S.C. 1672, 1676, 1677; Natural Gas Act (15 U.S.C. 717–717w); Natural Gas Policy Act (15 U.S.C. 3301–3432); Department of Energy Organization Act (42 U.S.C. 7101–7352); E.O. 12009, 3 CFR 142)

[17 FR 7387, Aug. 14, 1952]

EDITORIAL NOTE: For FEDERAL REGISTER citations affecting § 157.14, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at *www.govinfo.gov.*

**§ 157.15   Requirements for applications covering acquisitions.**

An application for a certificate authorizing acquisition of facilities, in addition to complying with the applicable provisions of §§ 157.5 through 157.14, shall include a statement showing:

(a) The exact legal name of the vendor, lessor, or other party in interest (hereinafter referred to as ''vendor'') the State or other laws under which vendor was organized, location of vendor's principal place of business, and a description of the business, operation or property of vendor covered by the application.

(b) Any certificate from the Commission, held by vendor, relating directly to the facilities which applicant seeks to acquire, citing the order, date thereof, docket designation, and title of the proceeding; reference to and designation of any companion applications by vendor for permission and approval pursuant to section 7(b) of the Natural Gas Act.

(c) The manner in which the facilities are to be acquired, the consideration to be paid, the method of arriving at the amount thereof, and anticipated expenses in addition to the consideration.

(d) The facilities to be acquired, their present use, their proposed use after acquisition, and whether they constitute all of vendor's facilities.

(e) Any franchise, license, or permit respecting the facilities involved, showing expiration date thereof, and the effect of the proposed acquisition thereon.

[17 FR 7389, Aug. 14, 1952]

617



**Federal Energy Regulatory Commission**        **§ 157.20**

and the other existing facilities of applicant, the operation or capacity of which will be directly affected by the facilities to be abandoned. This map shall clearly show the relationship of the facilities to be abandoned to the applicant's overall system and shall include:

(1) Location, length and size of pipelines.

(2) Location and size (rated horsepower) of compressor stations.

(3) Location and designation of each point of connection of existing facilities with (i) main line industrial and other consumers, pipeline or distribution companies and municipalities, indicating towns and communities served at wholesale or retail and (ii) gas-producing and storage fields, or other sources of gas supply. Designate on the map those facilities and services proposed to be abandoned.

[Order 280, 29 FR 4879, Apr. 7, 1964, as amended by Order 295, 30 FR 4130, Mar. 30, 1965; Order 493, 53 FR 15029, Apr. 27, 1988; Order 603, 64 FR 26606, May 14, 1999; Order 587-W, 80 FR 67312, Nov. 2, 2015]

### § 157.20  General conditions applicable to certificates.

Such of the following terms and conditions, among others, as the Commission shall find is required by the public convenience and necessity, shall attach to the issuance of each certificate and to the exercise of the rights granted thereunder.

(a) The certificate shall be void and without force or effect unless accepted in writing by applicant within 30 days from the issue date of the order issuing such certificate: *Provided, however,* That when an application for rehearing of such order is filed in accordance with section 19 of the Natural Gas Act, such acceptance shall be filed within 30 days from the issue date of the order of the Commission upon the application for rehearing or within 30 days from the date on which such application may be deemed to have been denied when the Commission has not acted on such application within 30 days after it has been filed: *Provided further,* That when a petition for review is filed in accordance with the provisions of section 19 of the Natural Gas Act, such acceptance shall be filed within 30 days

after final disposition of the judicial review proceedings thus initiated.

(b) Any authorized construction, extension, or acquisition shall be completed and made available for service by applicant and any authorized operation, service, or sale shall be available for regular performance by applicant within (period of time to be specified by the Commission in each order) from the issue date of the Commission's order issuing the certificate. Applicant shall notify the Commission in writing no later than 10 days after expiration of this time period that the end-user/shipper is unable to meet the imposed timetable to commence service.

(c) Applicant must file with the Commission, in writing and under oath, an original and four conformed copies, as prescribed in § 385.2011 of this chapter and, upon request must furnish an intervener with a single copy, of the following:

(1) Within ten days after the bona fide beginning of construction, notice of the date of such beginning;

(2) Within ten days after authorized facilities have been constructed and placed in service or any authorized operation, sale, or service has commenced, notice of the date of such placement and commencement and

(3) Within six months after authorized facilities have been constructed, a statement showing, on the basis of all costs incurred to that date and estimated to be incurred for final completion of the project, the cost of constructing authorized facilities, such total costs to be classified according to the estimates submitted in the certificate proceeding and compared therewith and any significant differences explained.

(d) With respect to an acquisition authorized by the certificate, applicant must file with the Commission, in writing and under oath, an original and four conformed copies as prescribed in § 385.2011 of this chapter the following:

(1) Within 10 days after acquisition and the beginning of authorized operations, notice of the dates of acquisition and the beginning of operations; and

(2) Within 10 days after authorized facilities have been constructed and within 10 days after such facilities have

been placed in service or any authorized operation, sale, or service has commenced, notice of the date of such completion, placement, and commencement, and

(e) The certificate issued to applicant is not transferable in any manner and shall be effective only so long as applicant continues the operations authorized by the order issuing such certificate and in accordance with the provisions of the Natural Gas Act, as well as applicable rules, regulations, and orders of the Commission.

(f) In the interest of safety and reliability of service, facilities authorized by the certificate shall not be operated at pressures exceeding the maximum operating pressure set forth in Exhibit G–II to the application as it may be amended prior to issuance of the certificate. In the event the applicant thereafter wishes to change such maximum operating pressure it shall file an appropriate petition for amendment of the certificate. Such petition shall include the reasons for the proposed change. Nothing contained herein authorizes a natural gas company to operate any facility at a pressure above the maximum prescribed by state law, if such law requires a lower pressure than authorized hereby.

(Sec. 20, 52 Stat. 832; 15 U.S.C. 717s)

[17 FR 7389, Aug. 14, 1952, as amended by Order 280, 29 FR 4879, Apr. 7, 1964; Order 317, 31 FR 432, Jan. 13, 1966; Order 324, 31 FR 9348, July 8, 1966; Order 493, 53 FR 15030, Apr. 27, 1988; Order 493–B, 53 FR 49653, Dec. 9, 1988; Order 603, 64 FR 26606, May 14, 1999]

## § 157.21 Pre-filing procedures and review process for LNG terminal facilities and other natural gas facilities prior to filing of applications.

(a) *LNG terminal facilities and related jurisdictional natural gas facilities.* A prospective applicant for authorization to site, construct and operate facilities included within the definition of "LNG terminal," as defined in § 153.2(d), and any prospective applicant for related jurisdictional natural gas facilities must comply with this section's pre-filing procedures and review process. These mandatory pre-filing procedures also shall apply when the Director finds in accordance with paragraph (e)(2) of this section that prospective

modifications to an existing LNG terminal are modifications that involve significant state and local safety considerations that have not been previously addressed. Examples of such modifications include, but are not limited to, the addition of LNG storage tanks; increasing throughput requiring additional tanker arrivals or the use of larger vessels; or changing the purpose of the facility from peaking to base load. When a prospective applicant is required by this paragraph to comply with this section's pre-filing procedures:

(1) The prospective applicant must make a filing containing the material identified in paragraph (d) of this section and concurrently file a Letter of Intent pursuant to 33 CFR 127.007, and a Preliminary Waterway Suitability Assessment (WSA) with the U.S. Coast Guard (Captain of the Port/Federal Maritime Security Coordinator). The latest information concerning the documents to be filed with the Coast Guard should be requested from the U.S. Coast Guard. For modifications to an existing or approved LNG terminal, this requirement can be satisfied by the prospective applicant's certifying that the U.S. Coast Guard did not require such information.

(2) An application:

(i) Shall not be filed until at least 180 days after the date that the Director issues notice pursuant to paragraph (e) of this section of the commencement of the prospective applicant's pre-filing process; and

(ii) Shall contain all the information specified by the Commission staff after reviewing the draft materials filed by the prospective applicant during the pre-filing process, including required environmental material in accordance with the provisions of part 380 of this chapter, "Regulations Implementing the National Environmental Policy Act."

(3) The prospective applicant must provide sufficient information for the pre-filing review of any pipeline or other natural gas facilities, including facilities not subject to the Commission's Natural Gas Act jurisdiction, which are necessary to transport regasified LNG from the subject LNG

**Federal Energy Regulatory Commission** § 385.2005

(i) Printed or reproduced, with each copy clearly legible;

(ii) On letter-size unglazed paper that is 8 to 8½ inches wide and 10½ to 11 inches long; and

(iii) Bound or stapled at the left side only, if the filing exceeds one page.

(2) Any log, graph, map, drawing, or chart submitted as part of a filing will be accepted on paper larger than provided in paragraph (b)(1) of this section, if it cannot be provided legibly on letter-size paper.

(c) *Filing via the Internet.* (1) All documents filed under this Chapter may be filed via the Internet except those listed by the Secretary. Except as otherwise specifically provided in this Chapter, filing via the Internet is in lieu of other methods of filing. Internet filings must be made in accordance with instructions issued by the Secretary and made available online at *http://www.ferc.gov.* Provisions of this chapter or directions from the Commission containing requirements as to the content and format of specific types of filings remain applicable.

(2) The Secretary will make available on the Commission's Web site a list of document types that may not be filed via the Internet, as well as instructions pertaining to allowable electronic file and document formats, the filing of complex documents, whether paper copies are required, and procedural guidelines.

(3) For purposes of statutes or regulations governing timeliness, a document filed via the Internet will be deemed to have been received by the Commission at the time the last byte of the document is received by the Commission.

(d) *Citation form.* Any filing with the Commission should comply with the rules of citation, except Rule 1.1, set forth in the most current edition of A Uniform System of Citation, published by The Harvard Law Review Association. Citations to specific pages of documents filed via the Internet should use the page numbers appearing in the PDF (Portable Document Format) version of the document available on the Commission's web site.

[Order 619, 65 FR 57091, Sept. 21, 2000, as amended by Order 2002, 68 FR 51143, Aug. 25, 2003; Order 647, 69 FR 32440, June 10, 2004; Order 703, 72 FR 65664, Nov. 23, 2007]

**§ 385.2004 Originals and copies of filings (Rule 2004).**

The requirements for making filings under this chapter are posted on the Commission's Web site at *http://www.ferc.gov.* The requirements cover documents and forms submitted on paper, on electronic media, or via the Commission's electronic filing systems.

[Order 737, 75 FR 43405, July 26, 2010]

**§ 385.2005 Subscription and verification (Rule 2005).**

(a) *Subscription.* (1) Any filing with the Commission must be signed.

(2) The signature on a filing constitutes a certificate that:

(i) The signer has read the filing signed and knows its contents;

(ii) The contents are true as stated, to the best knowledge and belief of the signer; and

(iii) The signer possesses full power and authority to sign the filing;

(3) A filing must be signed by:

(i) The person on behalf of whom the filing is made;

(ii) Any officer of the corporation, trust, association, or other organized group, on behalf of which the filing is made;

(iii) Any officer, agent, or employee of the governmental authority, agency, or instrumentality on behalf of which the filing is made; or

(iv) A representative qualified to practice before the Commission under Rule 2101 who possesses authority to sign.

(4) The signer of any filing may be required to submit evidence of authority to sign the filing.

(b) *Verification.* (1) The facts alleged in any filing need not be verified, unless verification is required by statute, rule, or order.

(2) If verification of any filing is required, the verification must be under oath by a person having knowledge of the matters set forth in the filing. If any verification is made by a person other than the signer, a statement must be attached to the verification explaining why a person other than the signer provides verification.

(3) Any requirement that a filing include or be supported by a sworn declaration, verification, certificate,

1247

statement, oath, or affidavit may be satisfied by compliance with the provisions of 28 U.S.C. 1746, provided that the filer, or an authorized representative of the filer, maintains a copy of the document bearing an original, physical signature until after such time as all administrative and judicial proceedings in the relevant matter are closed and all deadlines for further administrative or judicial review have passed.

(c) *Electronic signature.* In the case of any document filed in electronic form under the provisions of this Chapter, the typed characters representing the name of a person shall be sufficient to show that such person has signed the document for purposes of this section.

[Order 225, 47 FR 19022, May 3, 1982, as amended by Order 619, 65 FR 57092, Sept. 21, 2000; Order 653, 70 FR 8724, Feb. 23, 2005]

**§ 385.2006  Docket system (Rule 2006).**

(a) The Secretary will maintain a system for docketing proceedings.

(b) Any public information in any docket is available for inspection and copying by the public during the office hours of the Commission, to the extent that such availability is consistent with the proper discharge of the Commission's duties and in conformity with part 388 of this chapter.

[Order 226, 47 FR 19022, May 3, 1982; 48 FR 786, Jan. 7, 1983]

**§ 385.2007  Time (Rule 2007).**

(a) *Computation.* (1) Except as otherwise required by law, any period of time prescribed or allowed by statute or Commission rule or order is computed to exclude the day of the act or event from which the time period begins to run.

(2) The last day of any time period is included in the time period, unless it is a Saturday; Sunday; a day on which the Commission closes due to adverse conditions and does not reopen prior to its official close of business, even though some official duties may continue through telework-ready employees; part-day holiday that affects the Commission; or legal public holiday as designated in section 6103 of title 5, U.S. Code. In each case the period does not end until the close of the Commission business of the next day which is not a Saturday; Sunday; a day on which the Commission closes due to adverse conditions and does not reopen prior to its official close of business even though some official duties may continue through telework-ready employees; part-day holiday that affects the Commission; or legal public holiday.

(b) *Date of issuance of Commission rules or orders.* (1) Any Commission rule or order is deemed issued when the Secretary does the earliest of the following:

(i) Posts a full-text copy in the Division of Public Information;

(ii) Mails or delivers copies of the order to the parties; or

(iii) Makes such copies public.

(2) Any date of issuance specified in a rule or order need not be the date on which the rule or order is adopted by the Commission.

(c) *Effective date of Commission rules or orders.* (1) Unless otherwise ordered by the Commission, rules or orders are effective on the date of issuance.

(2) Any initial or revised initial decision issued by a presiding officer is effective when the initial or revised initial decision is final under Rule 708(d).

[Order 225, 47 FR 19022, May 3, 1982, as amended by Order 375, 49 FR 21316, May 21, 1984; Order 376, 49 FR 21707, May 23, 1984; Order 645, 69 FR 2504, Jan. 16, 2004; 84 FR 3983, Feb. 14, 2019]

**§ 385.2008  Extensions of time (Rule 2008).**

(a) Except as otherwise provided by law, the time by which any person is required or allowed to act under any statute, rule, or order may be extended by the decisional authority for good cause, upon a motion made before the expiration of the period prescribed or previously extended.

(b) If any motion for extension of time is made after the expiration of a specified time period, the decisional authority may permit performance of the act required or allowed, if the movant shows extraordinary circumstances sufficient to justify the failure to act in a timely manner.

1248

A-19

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on October 3, 2024, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Jason T. Perkins*
Jason T. Perkins
Attorney
